# EXHIBIT D

```
            UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF CALIFORNIA
               SAN FRANCISCO DIVISION
            CASE No. 4:12-CV-029494-CW

BRANDYWINE COMMUNICATIONS
TECHNOLOGIES, LLC,
     Plaintiff,
                                     DEPOSITION OF
                                   ANTHONY ACAMPORA

     vs.


AT & T CORP. AND SBC
INTERNET SERVICES, INC.
     Defendants.
_____
```

          T R A N S C R I P T of the stenographic

notes of THERESA L. TIERNAN, a Certified Court Reporter

and Notary Public, taken at the offices of KILPATRICK

TOWNSEND, THE GRACE BUILDING, 1114 AVENUE OF THE

AMERICAS, NEW YORK, NEW YORK, on MONDAY, MARCH 17,

2014, commencing at 9:54 a.m.

_____

**ANTHONY ACAMPORA**
**March 17, 2014**

```
 1    A P P E A R A N C E S:
 2
      FARNEY DANIELS, PC
 3
      BY:  LEI SUN, ESQ.,
 4
      BUTLER SQUARE, SUITE 445A
 5
      800 SOUTH AUSTIN, SUITE 200
 6
      GEORGETOWN, TX  78626
 7
      (512)582-2827
 8
      LSUN@FARNEYDANIELS.COM
 9
      FOR THE PLAINTIFFS.
10
11
12
      KILPATRICK, TOWNSEND & STOCKTON. LLP
13
      BY:  KRISTOPHER L. REED, ESQ.,
14
      1400 WEWATTA STREET
15
      DENVER, CO  80202
16
      (303) 405-8536
17
      KREED@KILPATRICKTOWNSEND.COM
18
      FOR THE DEFENDANTS.
19

20
21
22
23
24
25
```

**ANTHONY ACAMPORA**
**March 17, 2014**

```
 1                         I N D E X

 2    WITNESS                 DIR    CRS    RED    REC

 3    ANTHONY ACAMPORA

 4    BY:  MR. SUN              4

 5
                           E X H I B I T S
 6
      NUMBER       DESCRIPTION                   IDENT
 7
      EXHIBIT 1   CURRICULUM VITAE                 5
 8
      EXHIBIT 2   ACAMPORA EXPERT REPORT          13
 9
      EXHIBIT 3   REBUTTAL EXPERT REPORT
10                BURD

11    EXHIBIT 4   BREMER PATENT                   17

12    EXHIBIT 5   PALM PATENT                     37

13    EXHIBIT 6   MCHALE PATENT                   52

14    EXHIBIT 7   BROWN PATENT                    57

15    EXHIBIT 8   GRESZCZUK PATENT                68

16    EXHIBIT 9   EICHEN PATENT                   80

17    EXHIBIT 10  BREMER PATENT                  110

18

19

20

21

22

23

24

25
```

**ANTHONY ACAMPORA**
**March 17, 2014**

```
 1    A N T H O N Y   A C A M P O R A, residing at 6473
 2    Avenida Cresta, La Jolla, California, 92037, having
 3    been duly sworn, testifies as follows:
 4    EXAMINATION
 5    BY MR. SUN:
 6         Q    Good morning, Doctor.
 7    A    Good morning.
 8         Q    I know you've been deposed before.  I
 9    just to go over some ground rules.  So this will
10    probably be a repeat for you.  But I will be asking
11    you some questions today.
12              So AT & T's counsel is here, he may
13    object, but unless he instructs you not to answer,
14    you're expected to answer.
15              Do you understand that?
16    A    I do.
17         Q    So there's a court reporter here
18    transcribing your answers, so it's important not to
19    talk over each other.
20              Do you understand?
21    A    I do.
22         Q    And I need verbal answers from you, not
23    just a nod or shake of your head.
24              Do you understand that?
25    A    I do.
```

5

**ANTHONY ACAMPORA**
**March 17, 2014**

```
 1          Q     If you don't understand, please let me
 2    know.  Okay?
 3    A       Okay.
 4          Q     And if you answer a question, I'll
 5    assume that you understood it.
 6                Is that fair?
 7    A       Sure.
 8          Q     If you need a break or are
 9    uncomfortable, just let me know.  We can take a
10    break at a natural breaking point.
11    A       Good.
12          Q     And is there any reason you can't give
13    your full and accurate testimony today?
14    A       No.
15          Q     Thank you.
16                MR. SUN:  I would like to mark as
17    Exhibit 1, I believe Dr. Acampora's CV, which is
18    attached to his expert report that he provided in
19    this case.
20                (Exhibit received and marked EXHIBIT 1 for
21                identification.)
22    BY MR. SUN:
23          Q     I notice you have another copy of a --
24    is that your expert report there?
25    A       It is.
```

**ANTHONY ACAMPORA**
**March 17, 2014**

1          Q     Okay.  Does it have the exhibits on
2    there or no?
3    A      It does not.
4          Q     Okay.  That's fine.  Okay.  So if you
5    can look at Exhibit 1.
6               So this appears to be a copy of your
7    CV, correct?
8    A      It is.
9          Q     And does everything appear to be
10   correct from your superficially looking at this?
11   A      From the superficial inspection, it appears
12   to be correct, yes.
13         Q     I just want to go over briefly your
14   history -- your work history.
15              What do you currently do for a living,
16   Dr. Acampora?
17   A      I'm currently professor of electrical
18   computer engineering emeritus at UC San Diego, which
19   means that I pursue research electively, I teach
20   electively, I supervise students electively, and
21   most of my time is spent consulting.
22              Q     Okay.
23              You've been doing that since 2008?
24   A      That's correct, I believe I formally retired
25   from UCSD in December of 2007.

**ANTHONY ACAMPORA**
**March 17, 2014**

```
 1          Q      Okay.  And prior to 2007, you were a
 2    regular member of the faculty at UCSD?
 3    A      That's correct.  I was a professor of
 4    electrical and computer engineering with full
 5    faculty responsibilities, teaching, research,
 6    doctoral student supervision and administer of work,
 7    yes.
 8          Q      Okay.
 9               So looking at your description of
10    responsibilities on page 1, the bottom of page 1
11    there, just what have been your primary areas of
12    responsibility in the past several years since 2008?
13    A      At UCSD?
14          Q      Yes.
15    A      Well, as I said, I retired in December of
16    2007, so I have no formal responsibilities
17    whatsoever.
18          But I have taught my graduate-level course in
19    wireless networks.  I finished up my remaining three
20    or four PhD students, and I continued to conduct
21    research.
22          Q      So the research that you have still
23    been conducting, what areas do they relate to?
24    A      Mostly in the field of wireless
25    communications --
```

**ANTHONY ACAMPORA**
**March 17, 2014**

```
 1          Q      Okay.
 2    A      -- and last-mile problems.
 3          Q      And what specifically was your research
 4    with respect to last-mile problems?
 5    A      Well, last mile takes a variety of forms, and
 6    what I've been looking at is the use of free space
 7    optics to bridge the last mile.
 8          Q      Is that referring to optical networks?
 9    A      Well, optical networks means something a
10    little different.  That would be cabled optical
11    networks.
12          What I've been looking at as far as last-mile
13    solution has been free space optical networks,
14    different topic.
15          Q      Okay.  So they're not cabled networks?
16    A      No, they're not cabled.  In fact, we tend to
17    avoid cabling.
18          Q      Have you been doing any research on
19    DSL-related technology in the past several years?
20    A      No.
21          Q      What about spectrum management, have
22    you done any research related to that in the past
23    few years?
24    A      As far as radio is concerned -- I'm not sure
25    I would say that I've been doing work on spectrum
```

**ANTHONY ACAMPORA**
**March 17, 2014**

```
1    management so much as respecting spectrum

2    management.  There really isn't much work to be done

3    except routine things, such as ensuring that

4    spectrum management rules are obeyed.

5         Q     Okay.  And what about from 2000 to

6    2007, have you done any work related to DSL during

7    that time period?

8    A     Well, by "work," do you mean research?

9         Q     Yes.  Research.

10   A     No, I have not done -- you're asking in 2000

11   to 2007 in particular?

12        Q     Yes.

13   A     I have not done research on DSL, but my

14   graduate-level course, which is focused on wireless

15   networks, has a DSL module in it --

16        Q     Okay.

17   A     -- because understandably, with wireless

18   communications being one form of last-mile solution,

19   I try to expose the students to all other forms of

20   last-mile solutions so that they get an

21   understanding of what the different opportunities

22   are and what the different technologies are.

23        So DSL is part of a module in my

24   graduate-level course.

25        Q     Understood.  Thank you.
```

ANTHONY ACAMPORA
March 17, 2014

```
 1                 Is there anything you've done related
 2   to DSL that's not -- that you haven't discussed in
 3   the past ten years or so?
 4   A      I'm not sure I understand the question.
 5        Q     So I think you mentioned teaching a
 6   class and also research.
 7                 Is there something other than that
 8   that's related to DSL that you've been involved with
 9   in the past ten years?
10   A      I guess I'm not quite sure how to answer that
11   question.
12            I certainly keep up with the subject.  Many
13   of my colleagues have worked, and some continue to
14   work, on DSL.  I consult with them.  I follow the
15   literature.  I guess I've given a lot of thought to
16   DSL, and especially more recently as the wireless
17   field has embraced optical regarding frequency
18   division multiplexing as one of its physical layer
19   technologies, I've gotten more closely -- I've
20   reviewed more of the DSL work, because the
21   technologies are very, very, very related.
22        Q     Okay.  Okay.  Thank you.
23                 But you haven't done any specific
24   commercial consulting related to DSL in the past ten
25   years?
```

ANTHONY ACAMPORA
March 17, 2014

```
 1   A       No, no, that's a different question.

 2           Yeah, I have.

 3           Q       Okay.  When was that about?

 4   A       It's most been mostly in the field of what

 5   I'm doing in this matter.  I've been engaged as --

 6   as an expert in matters involving DSL.

 7           Q       In litigation?

 8   A       Yes.

 9           Q       Okay.

10   A       Yes.

11           Q       How many cases have you consulted on

12   involving DSL?

13   A       Three or four.

14           Q       Is this within the past five years?

15   A       Within the past five years.

16           Q       Okay.  Now, Dr. Acampora, you're not an

17   attorney, correct?

18   A       That is correct.

19           Q       Okay.  And you don't have a law degree?

20   A       That is correct.

21           Q       You haven't had any formal training as

22   a lawyer?

23   A       That is correct.

24           Q       Okay.  Okay.

25                   I understand you've been hired as an
```

**ANTHONY ACAMPORA**
**March 17, 2014**

```
 1    expert by AT & T International in this case.  Is
 2    that right?
 3    A      That is correct.
 4           Q     And you've provided some opinions
 5    regarding the validity or invalidity of the two
 6    patents in this case?
 7    A      That's correct.
 8           Q     And these patents are U.S. Patents
 9    6,970,501 and 7,794,472, correct?
10    A      Are you asking me that as a question?
11           Q     Yes.
12    A      If you don't mind --
13           Q     No problem.
14    A      -- repeating those numbers --
15           Q     Okay.
16    A      -- only because I have not memorized them and
17    given a chance to look at them in my report.
18           Q     Right.  I think I misspoke.
19                 So 6,970,501?
20    A      That's one of them.
21           Q     7,894,472?
22    A      That's the other one, yes.
23           Q     Great.
24                 And -- so you have authored an expert
25    report containing your opinions, correct?
```

**ANTHONY ACAMPORA**
**March 17, 2014**

```
 1    A      Correct.

 2           Q      And is your -- what you're holding

 3    there in front of you, you brought a copy of your

 4    report?

 5    A      I did.

 6           Q      Okay.

 7                  MR. SUN:  Could we mark that as

 8    Exhibit 2?

 9                  MR. REED:  Sure, or do you have a fresh

10    copy?

11                  MR. SUN:  I do, but since this is the

12    copy he's relying on, I'll just mark that.

13                  MR. REED:  That's fine.

14           (Exhibit received and marked EXHIBIT 2 for

15           identification.)

16                  MR. REED:  Unless you wanted it as a

17    souvenir.

18                  THE WITNESS:  No, no, no, that's quite

19    all right.

20                  MR. SUN:  I might be reading off this.

21    BY MR. SUN:

22           Q      Now, Dr. Acampora, has any of your

23    opinions changed since you published this report?

24    A      No.

25           Q      Are there any additional opinions that
```

**ANTHONY ACAMPORA**
**March 17, 2014**

```
1    you formed since you first published this report?

2    A      Well, I'm not sure quite how to answer that

3    question.  You mean with regard to validity?

4           Q      Correct.

5    A      No.

6           Q      What about invalidity?

7    A      When I said, validity or invalidity, no.

8           Q      Oh, okay.

9    A      But I've formed other opinions, sure.

10          Q      Oh, okay.

11                 Have you formed opinions regarding --

12   with regards to infringement in this case?

13   A      None.

14          Q      Okay.  Do you understand that

15   Brandywine, who is the plaintiff in this case, has

16   an expert named Nick Burd -- Nicholas Burd?

17   A      Yes.

18          Q      Are you aware that he's produced a

19   rebuttal report in response to your report?

20   A      I have -- I am aware.

21          Q      Have you reviewed this report?

22   A      I have.

23          Q      Okay.  Have you formed any opinions in

24   response to his report?

25   A      Well, yeah, that's one of the reasons I
```

**ANTHONY ACAMPORA**
**March 17, 2014**

1   paused when you asked the question as to whether I

2   formed opinions since I wrote my report, and I said

3   no, not with regard to validity or infringement.

4          I certainly formed opinions with regard to

5   what the Brandywine expert report said --

6          Q     Uh-huh.  Okay.

7   A      -- and I disagreed with much of what he said.

8                MR. SUN:  I'm just going to get an

9   exhibit.

10               So let's mark as Exhibit 3 the rebuttal

11  expert report of Dr. Nicholas Burd.

12          (Exhibit received and marked EXHIBIT 3 for

13          identification.)

14  BY MR. SUN:

15          Q     Now, I just want to start with your

16  report for the time being.

17               Before we get into this, do you have a

18  general understanding of what spectrum management

19  classes are in the context of these patents?

20  A      I'm not sure I fully understand that

21  question.

22          You say in the context of these patents, you

23  mean in terms of what's disclosed in the patents?

24          Q     I mean, what spectrum management

25  classes are, what they mean as part of the claims.

**ANTHONY ACAMPORA**
**March 17, 2014**

```
 1   A      Well, okay, that -- that's actually a pretty
 2   broad question.
 3          I'm not sure that I do have an understanding
 4   or that there is any understanding what spectrum
 5   management classes mean as part of the claims.
 6          Do I have an understanding what spectrum
 7   management classes are today, sitting here?  Sure.
 8   And that's why I asked earlier do you mean in the
 9   context of the patents or more generally?
10          Q      Okay.  Let's talk just briefly about
11   generally, outside of the patents.
12              In the DSL world, what are spectrum
13   management classes, as you understand it?
14   A      Okay.  It was recognized fairly early on that
15   with the proliferation of DSL standards and the fact
16   that DSL modems would be sharing the same copper
17   wire bundles with other services, including voice,
18   including voice band data, including ISDN, numerous
19   other services that are provided over copper wire to
20   subscribers, there would be a need -- or there may
21   be a need to create some guidelines that future
22   generations of -- not just DSL but any new
23   technology that would be sharing the same copper
24   wire bundles might adhere to so they didn't
25   unacceptably cause cross-talk interference one to
```

ANTHONY ACAMPORA
March 17, 2014

```
 1    the other.
 2          And the -- and the ANSI -- American National
 3    Standard Institute actually set about creating
 4    classes, spectrum management classes, that, based
 5    upon some very rigorous simulations and calculations
 6    would be reasonably -- if one would deploy -- if one
 7    were to deploy a device conforming with any of these
 8    classes, there would be a reasonable degree of
 9    confidence that unacceptable cross talk would not be
10    induced into neighboring wires interfering with
11    so-called basis services -- a set of basis services.
12          Q     Okay.  Thank you.
13                And is that explanation different than
14    how you understand the spectrum management classes
15    as they're described in the patent?
16    A     Can I see the patents, please?
17          Q     Sure.
18                MR. SUN:  We'll be on 4 and 5,
19    exhibits?
20                Mark as Exhibit 4 the '501 patent.
21          (Exhibit received and marked EXHIBIT 4 for
22          identification.)
23                MR. SUN:  Could you repeat the
24    question, please?
25          (Stenographer reads back as requested.)
```

ANTHONY ACAMPORA
March 17, 2014

1   A      Okay.  So, again, I'm not quite sure how to

2   interpret that question, but let me give you at

3   least one answer to the question you asked.

4          If we look at Claim 1 as an example, Claim 1

5   of the '501 patent, part of that claim includes one

6   or more spectrum management classes defined by a

7   standard.  And each spectrum management class

8   defining how a spectral density requirements, and

9   then the claim goes on.

10         I think that there's a real problem

11  associated with what I just read because when I go

12  back -- and now I'm looking strictly at the -- at

13  the patent, the context of the patent -- the claim

14  refers to spectrum management classes defined by a

15  standard.  But at the time of the filing date of

16  this patent, there was no standard.

17         So, in that sense, I don't think I

18  understand -- in fact, I know I do not understand

19  just what the spectrum management classes are.

20  Because they, as claimed, they need to be defined by

21  a standard and there was no such standard.

22         Q      Okay.

23  A      So in that sense, I did not understand the

24  spectrum management classes that are claimed.

25         Q      Just putting aside the specifics of any

ANTHONY ACAMPORA
March 17, 2014

```
 1    particular standard, you just described outside of
 2    the patent that there's a concept of spectrum
 3    management classes.
 4              Is that your --
 5    A      No, I said, today, as I sit here today, do I
 6    understand what spectrum management classes are?  I
 7    do.
 8         Q     But that is not the same and in your
 9    mind as what spectrum management classes are as
10    they're recited in the claims?
11    A      That's correct, because the claims do not
12    speak of spectrum management classes, they speak of
13    spectrum management classes defined by a standard.
14    And at the time of the filing of this patent, there
15    was no standard.
16         So even if spectrum management classes
17    eventually emerged, what those classes are -- what
18    the definition of those classes are that might have
19    emerged was not known when this patent was filed.
20         So I could not tell you what the spectrum
21    management referenced.  If you asked me -- give
22    me -- give me the -- how a spectral density and
23    other features of one of the spectrum management
24    classes claimed by this patent, I could not tell
25    you, because there was no such standard.
```

**ANTHONY ACAMPORA**
**March 17, 2014**

```
 1          Q     But there is still a concept of such

 2   classes at the time of the filing, correct?

 3   A      I don't know what you mean by the "concept of

 4   classes."

 5          Q     What I mean is just what you

 6   explained -- what spectrum management classes are

 7   outside of this patent, you explained that your

 8   classes -- guidelines that's intended to -- to

 9   minimize cross talk between various basis systems.

10                Do you remember that?

11   A      Well, you paraphrased a little bit of what I

12   said, you know, but I understand what my response

13   was.

14          And today, it's a fairly well-known concept.

15   Then it was an emerging concept.  There was a

16   standards body.  There was even a draft standard.

17          So in terms of what the objectives of the

18   standardization body -- of the standards body was,

19   what was their objective, I think that their

20   objective was to create specific classes -- a set of

21   classes that had, as I said earlier, some

22   reasonable -- they would give a user -- or deploy a

23   reasonable assurance that if what was being deployed

24   conformed with one of these guidelines -- and there

25   would be several guidelines in a set defining these
```

ANTHONY ACAMPORA
March 17, 2014

```
 1   classes -- then interference with these bases system
 2   would have been acceptable most of the time.
 3          Q     Okay.  But that's not what you believe
 4   spectrum management classes are as they're recited
 5   in this claim?
 6   A      Well, as I said, these spectrum management
 7   classes are defined by a standard.
 8          If this patent had been written five years
 9   later, that might have been understandable because
10   by that point there was a standard.  But at the time
11   it was filed, there was no standard.  I don't think
12   that one would have known what the claimed spectrum
13   management classes are, because there were none.
14          Q     Okay.  Okay.  So we'll get to that
15   later.
16               So I understand AT & T's position is,
17   because of this term -- this term itself is
18   indefinite, but I also -- I also know that
19   Brandywine has a construction -- has proposed a
20   construction of spectrum management classes.
21               Is that your understanding?
22   A      Yes.
23          Q     Okay.  So I know you did some prior art
24   analysis of these claims.
25               Were you using Brandywine's
```

ANTHONY ACAMPORA
March 17, 2014

```
 1   construction of the term, when you compared the
 2   claims to the prior art?
 3   A      I did.
 4        Q      Now, I understand Dr. Burd in his
 5   rebuttal report has offered some further refinements
 6   on the meaning of spectrum management classes, if we
 7   can take a look at that.  Look at Dr. Burd's report.
 8   Pages starting at 17.
 9           So starting at page 17, at the very
10   bottom it says, "Before delving into a discussion of
11   Palm, it is useful to provide an explanation of the
12   concept of spectrum management classes as they are
13   disclosed in the patents in suit."
14           And then on page 18, there's a
15   paragraph starting with "first" and a paragraph
16   starting with "second."
17           Do you see those?
18           Just take a minute to read through that
19   page.
20   A      How far do you want me to read?
21        Q      Just to the very top of page 19.
22   A      Okay.
23        Q      So, I think there are two points being
24   made here.  First, Dr. Burd says, "It is useful to
25   understand that the spectrum management classes
```

ANTHONY ACAMPORA
March 17, 2014

```
 1   described in the patents in suit are understood to
 2   be spectrally compatible with one another."
 3              Do you agree with that?
 4   A     And, actually, I do not agree with that.
 5         Q     Can you explain why?
 6   A     Well, the patent refers to a draft standard.
 7         Now, can I see that draft standard?  I just
 8   want to be sure that what I'm about to say is
 9   accurate.  I know that what I'm about to say appears
10   in the issued standard.  I don't know if it appears
11   in the draft standard.
12         Q     I'm sorry, I don't have a copy of that?
13   A     Then I might not be able to complete my
14   answer.
15         What I can tell you is that with regard to
16   the issued standard, not the draft standard but the
17   issued standard, if -- let's go back to Dr. Burd.
18         He refers to spectrum as -- his sentence
19   reads, "First, it is useful to understand that the
20   spectrum management classes described in the patents
21   in suit were understood to be spectrally compatible
22   with one another."
23         Now, the problem I'm having in not having
24   access to the draft standard is I'm not sure just
25   what the draft standard said on this subject,
```

**ANTHONY ACAMPORA**
**March 17, 2014**

1   because that's the only basis for spectrum

2   management that's brought up in the patent at all,

3   that draft standard.

4          The issued standard makes it clear that the

5   intent of the spectrum management classes is to

6   ensure that -- how does -- how is the spectrum

7   management class created?

8          There is an exhaustive set of calculations

9   and simulations performed under a variety of

10  assumptions to assure that if certain criteria are

11  met by this device under test, there will -- most --

12  most of the time it will not be unacceptable

13  interference caused by basis -- a set of basis

14  services.

15         Those basis services may not include other

16  members of the spectrum management class, may or may

17  not.  In fact, the patent -- the standard at issue

18  that I believe makes it clear -- and if I had a copy

19  of it, I could make certain of this -- that the

20  basis, that may expand with time by including

21  previously -- previously defined -- a previously

22  defined spectrum management class, and only then

23  would future classes be created in such a way that

24  the introduction of a new service complying with a

25  future class would be guaranteed to, most of the

**ANTHONY ACAMPORA**
**March 17, 2014**

1    time, not unacceptably interfere with any of the

2    basis services, including a basis service that

3    conformed with an earlier spectrum management class.

4         First, that earlier spectrum management class

5    must be accepted as a basis before you can say

6    anything about a future spectrum management class

7    being compatible with it.

8         Q    Uh-huh.

9    A    So if that language appears also in the draft

10   standard, which is the only basis for spectrum

11   management classes created in this -- in the patent

12   itself, that -- if that intent is reflected in that

13   draft standard -- and I don't know if it is, but if

14   it is, I would have to disagree with what Dr. Burd

15   says here, because it's, strictly speaking, not

16   true.

17        Q    So if we change the sentence to say --

18   instead of saying, "described in the patents in

19   suit," but if we change that part to say, "described

20   in the issued standard," would you -- would you

21   agree the spectrum management classes described in

22   the issued standard are understood to be spectrally

23   compatible with one another?

24   A    No, no.  I just explained why.  It's only --

25   it depends on what point in time.

ANTHONY ACAMPORA
March 17, 2014

1           So, once again, the standard speaks of the

2    basis set.  The intent of the standard is to create

3    requirements free that such that if a new service

4    conforms with this requirement, it will not, most of

5    the time, accept or create unacceptable interference

6    into the basis system.

7           That basis system includes all sorts of

8    services having nothing to do with DSL or any of the

9    spectrum management classes being created by the

10   standard.  It's voice, voice band data.  If you give

11   me the standards, it's a whole list of existing

12   services that use copper wire that preexisted DSL,

13   preexisted spectrum management classes, and it's

14   those services that the spectrum management standard

15   intended to protect.

16          Now, along the way, as I said, if a spectrum

17   management class is created, if the requirements are

18   defined such that a service conforming to these

19   requirements do not interfere with the basis set,

20   it's possible -- not mandatory, it's possible that

21   the spectrum -- the requirements of that spectrum

22   management class will itself become a member of the

23   basis set.  So that if a new service is considered,

24   and a new spectrum management class is going to be

25   created to cover that new service, only then will

ANTHONY ACAMPORA
March 17, 2014

```
 1   the introduction of service corresponding to that
 2   new class be such that the likelihood of interfering
 3   with the earlier spectrum management class be --
 4   would -- only then would it be such that there would
 5   be a low likelihood of interference with that
 6   earlier class.
 7         There was no intent to ensure spectrum
 8   compatibility among these classes.  The intent is to
 9   protect the basis set.  It's only if a class moves
10   into the basis set that it would then also become
11   protected.
12         Q    Okay.  So what you're saying, and just
13   to clarify what you're saying, there are classes in
14   the issued standard as defined, and what you're
15   saying is they are not understood to be spectrally
16   compatible, the Class I and Class II, Class III?
17   A     Depends.  Depends on what point in time.
18         If Class I -- let's say there was Class I.
19   If Class I becomes part of the basis, then Class II
20   and III would not unacceptably interfere with Class
21   I.  If Class I did not become part of the basis, it
22   may or may not suffer interference with Class II and
23   III, because it would not be one of the basis set of
24   services for which the calculations would have been
25   performed to see if the new class unacceptably
```

ANTHONY ACAMPORA
March 17, 2014

```
 1   interfered or not.
 2           That's how it works.
 3       Q     Okay.  I think there may be a
 4   disagreement with this -- this statement from
 5   Dr. Burd, but do you understand his statement
 6   here -- do you understand his description of what --
 7   his description of this requirement for the phrase
 8   "spectrum management class"?
 9   A     I'm not sure I understand your question.  Ask
10   that again.
11       Q     Do you understand what he means by that
12   first sentence on the top of page 18?
13           Regardless of whether you disagree with
14   it, do you understand it?
15   A     I'm not sure I do.  I'm not sure I do.  I
16   would have to do some guessing as to what he was
17   trying to mean here.
18           By the way, there was a number of things that
19   I don't think are, you know, crystal clear in his
20   second point.  And if I read elsewhere, in this
21   first one.
22       Q     What if we just took off the word,
23   "described in the patents in suit," do you
24   understand what Dr. Burd is saying, that spectrum
25   management classes are understood to be spectrally
```

ANTHONY ACAMPORA
March 17, 2014

```
 1   compatible with one another?
 2   A      Well, that's what I just said, I actually
 3   disagree with that statement, and I told you why.
 4          Q      So putting aside whether you agree or
 5   disagree, do you understand what he's asserting?
 6   A      So now you want me to read just "a patent in
 7   suit" out of the sentence?
 8          Q      Yeah, take that out of the sentence --
 9   A      Okay.
10          Q      -- and regardless of whether you agree
11   or disagree with that sentence, do you understand
12   what he's saying?
13   A      Well, let me take out a few things.
14          Q      Okay.
15   A      Let me take out the words "described in the
16   patents in suit --"
17          Q      Sure.
18   A      -- let me take all of that out.
19          Q      Sure.
20   A      So let's be sure that I understand -- let me
21   read back what I think you're asking.
22          You're asking me to look at his -- look at
23   the statement:  "First, it is useful to understand
24   the spectrum management classes are understood to
25   be" -- let me make another modification.  Let me
```

ANTHONY ACAMPORA
March 17, 2014

```
 1   take out the word "the."
 2        "First, it is useful to understand that
 3   spectrum management class are understood to be
 4   spectrally compatible to one another."
 5        Q    Yes.
 6   A    You're asking me do I understand that
 7   statement?
 8        Q    Correct.
 9   A    Independent of whether I agree with it?
10        Q    Correct.
11   A    I would understand that statement, yes.  That
12   I think I would understand.
13        Q    Okay.  So I'm going to spend some time
14   today to sort of go over some of the prior art
15   references, and I want to -- basically, I want to
16   evaluate these prior art references in light of
17   these two points that Dr. Burd is making.
18             So I want you to keep this
19   understanding of this first point in mind as we go
20   through this exercise.  That's all I'm saying.
21   Regardless of whether you agree with Dr. Burd is
22   saying here, I want you to --
23   A    Well, we'll have to take that question by
24   question, because I'm not -- you'll have to give me
25   a question, because I don't understand the
```

ANTHONY ACAMPORA
March 17, 2014

```
 1    instruction you just gave me.
 2         Q    Okay.  Okay.  Okay.  I'm just giving
 3    you a preview of where I'm going.
 4    A    Okay.
 5         Q    And then, if we look at number 2, the
 6    second point, he says, "It is useful to understand
 7    that spectrum management classes, quote-unquote,
 8    involve a collection of requirements which are
 9    defined and fixed as a group."
10              Do you understand that?
11    A    No, I don't.
12         As a group -- I'm actually struggling -- I'm
13    actually not sure what he's saying here.
14         Q    Okay.
15    A    "Second, it's useful to understand the
16    spectrum management classes involve a collection of
17    requirements."
18         If I stop there, I have an understanding of
19    what he's saying.
20         "Which are defined" -- let's say -- "which
21    are defined as a group."
22         I'm not sure I understand that.
23         And defined and fixed as a group.
24         If it read, It's useful to understand that
25    spectrum management classes involve a collection of
```

ANTHONY ACAMPORA
March 17, 2014

1    requirements, which are fixed, I think I would
2    understand that.  Which are defined and fixed, I
3    would understand that.
4           As a group?  I'm not sure -- I'm not sure I
5    understand that.
6           If he means there are sets of requirements,
7    one set associated with one spectrum management
8    class, and that there are, in fact, several such
9    sets of requirements, if that's the group, then I
10   would have some -- I might have an understanding of
11   what he's saying here.
12          Q     Yeah.  I think that's -- that's pretty
13   close.
14               I think what he's attempting to
15   describe is the regime that's been issued T1.417
16   standard.
17               Does that help you understand the
18   sentence?
19   A     Well, are you saying that's what he meant
20   here, the issued standard?
21          Q     Correct, yes.
22   A     Okay.  So let me make sure I understand what
23   you're asking me.
24          Let's make the assumption that he actually
25   included the words so that this sentence read as

**ANTHONY ACAMPORA**
**March 17, 2014**

1    follows:  "Second, it is useful to understand that
2    the spectrum management classes defined by the
3    issued standards involve a collection of
4    requirements which are defined and fixed as a
5    group."
6            I would understand that.
7            Q    Okay.  Great.
8    A       With a lot of -- I would understand that
9    assuming that he actually meant what I -- what I
10   understand this to mean based upon our earlier
11   discussion, which remember, I -- I characterized
12   this here using a lot more words than he did.
13           One spectrum management -- there's a set of
14   requirements, so a set of requirements, associated
15   with one member -- associated with one spectrum
16   management class.
17           If I have several spectrum management
18   classes, there would be several sets of
19   requirements.  If those sets of requirements is what
20   he is referring to as "group," that I understand.
21           But that's not exactly what he says here.
22           Q    So what you're saying is the word
23   "group" is referring to a group of classes, or the
24   group of requirements?
25   A       Group of requirements.

ANTHONY ACAMPORA
March 17, 2014

```
 1            Q      Oh, Okay.  I think we're in agreement.
 2                   So I think we -- I just want to keep
 3     these two points in mind as I'm going over --
 4     A      Well, I'm trying to, but these are not
 5     crystal clear, as I said earlier.
 6            Q      Okay.  Got it.  Understood.
 7                   Okay.  Let's see.
 8                   So if we can turn back to your report.
 9                   And, by the way, on the second point,
10     fixed as a group, you -- do you agree with that
11     characterization of spectrum management classes?
12     A      Well, are we now looking at the issued
13     standard or any of the subsequent standards?
14            Q      Let's take the issued standard.  Do you
15     agree that's true for the issued standards?
16     A      Just the first issued standard?
17            Q      The first issued standard.
18     A      Well, with -- with my understanding of what
19     "group" means is a set of requirements associated
20     with a spectrum management class.  There are several
21     such classes, therefore, there are several such sets
22     of requirements.  The sets of requirements comprise
23     the group that I'm understanding.
24            Q      Okay.  Thank you.
25                   All right.  If we can turn to page 40
```

**ANTHONY ACAMPORA**
**March 17, 2014**

```
 1   of your report.
 2           This page is your prior art analysis in
 3   your report.
 4   A     Give me just a moment, I want to just put
 5   myself in the right position in this report.
 6           Q     Okay.
 7           So this is the start of your prior art
 8   analysis of your invalidity report, this page,
 9   correct?
10   A     It is.
11         Q     And if you flip over one, the first
12   reference you looked at is the Palm reference.  Is
13   that right?
14   A     Yes.
15         Q     Okay.  And if we look at page 42 to 43,
16   there is a discussion of the limitation modes that
17   are compatible with one or more spectrum management
18   classes defined by a standard...
19   A     Yes.
20         Q     And starting at page 43, line seven, it
21   begins to say, "Person of ordinary skill in the art
22   would understand that the disclosure in Palm of the
23   various XDSL standards necessarily discloses the
24   content of those standards, each of which defines
25   power spectral density requirements."
```

**ANTHONY ACAMPORA**
**March 17, 2014**

```
 1              So it's not clear to me what you're

 2    saying there.  Are you saying that the XDSL

 3    standards themselves disclose the spectrum

 4    management classes?

 5              MR. REED:  Object to the form.

 6    A      That's the not what it says.

 7          Q      So in your opinion --

 8    A      Whoa, whoa, let me take a step back.

 9          Q      Sure.

10    A      Under whose construction spectrum management

11    class?

12          Q      Okay.  I understand AT & T believes

13    this term was indefinite.  So I assume all of your

14    analysis is done under Brandywine's construction --

15    or your construction of Brandywine's construction.

16    Is that correct?

17    A      Well, I have to look at that to be sure

18    because, like I said, I didn't accepts AT & T's

19    construction.

20              I did attempt to do my analysis under both

21    sets of constructions.  But I'd have to look at that

22    in particular.  But certainly under Brandywine's

23    construction.

24          Q      Sure.

25              So the first question is, understand
```

ANTHONY ACAMPORA
March 17, 2014

```
 1   your analysis of Palm, what meets the spectrum
 2   management class limitation in Palm?
 3   A     Can I have a copy of Palm?
 4         Q     Okay.  Sure.
 5               MR. REED:  So what are we up to.
 6   Marking as Exhibit 5 a patent to Palm, which is
 7   discussed --
 8               THE WITNESS:  And do you have -- I have
 9   it in my report, but to save me the time of flipping
10   back and forth and still keeping this in order, does
11   anyone have a copy of the proposed claim
12   constructions from both sides?
13               MR. REED:  Do you have an extra copy of
14   his report?
15               If we could just tear a couple pages
16   out of here.
17               THE WITNESS:  Yeah, it's all in my
18   report, I just --
19               MR. SUN:  Could I tear that Exhibit 5?
20         (Exhibit received and marked EXHIBIT 5 for
21         identification.)
22               MR. SUN:  Here is a set of --
23               THE WITNESS:  You had a stapled copy?
24               MR. SUN:  There are multiple staples.
25               THE WITNESS:  I would have preferred to
```

ANTHONY ACAMPORA
March 17, 2014

```
 1   take this one apart because --
 2                 MR. SUN:  That's okay.
 3                 THE WITNESS:  Was there a question?
 4   BY MR. SUN:
 5       Q    I believe my question was what a Palm
 6   discloses spectrum management classes?
 7       A    Okay.  So, yeah, and I asked for the proposed
 8   constructions.
 9            So Brandywine's proposed construction for
10   spectrum management classes is requirements for data
11   transmission commitment designed to minimize the
12   interference with other nearby data transmission
13   equipment.
14            Now, every DSL standard includes power and
15   power spectral density requirements, the intent of
16   which -- at least one intent of which is to minimize
17   interference with other nearby data transmission
18   equipment.
19            So under Brandywine's construction, DSL --
20   every DSL standard would include -- would be a
21   spectrum management class, and Palm discloses
22   several DSL standards.  Each of those would have its
23   respective power spectral density requirements
24   issued here, but the problem actually goes beyond
25   that and actually mentions -- I actually have this
```

ANTHONY ACAMPORA
March 17, 2014

```
 1    footnoted.  It's footnote 43 in my report, and let
 2    me read from -- from Palm itself.
 3         Okay.  Now, I'm looking at column 4, line 42
 4    of Palm.  "According to an object of the present
 5    invention, the method for selecting a communication
 6    standard from among a plurality of communication
 7    standards and comprises auditing condition of
 8    communication channel and selecting the
 9    communication standard based upon the audited
10    condition of communication channel and a capability
11    of each of the plurality communication standards."
12         Now, it's quite clear that what Palm is doing
13    in this disclosure is the following, and I'll
14    simplify this:  Palm involves measuring -- making
15    measurements of a line and choosing one of a set of
16    alternatives for communicating.  It can choose ADSL
17    or VDSL or CDSL.  There's a finite set of possible
18    choices.  The line is measured.  Based upon the line
19    measurements, one of these is chosen.
20         Now, that's one example.  But this language
21    that I just read would say that, as an example, if
22    there had been a second standard including spectrum
23    management classes, such as the proposed standard
24    that existed on the date of the patent, that
25    proposed standard also has included within it
```

ANTHONY ACAMPORA
March 17, 2014

```
 1   standardized -- a standardized list of alternatives,
 2   one of which would be chosen based upon a line
 3   measurement.
 4          So Palm is disclosing the spectrum management
 5   classes certainly under Brandywine's construction
 6   and it would be disclosing spectrum management
 7   classes that actually existed within the draft
 8   standard.
 9          Now, they never emerged as final standards,
10   but if one took those at the time of the patent,
11   given that's all that existed, if one took those as
12   the classes in the draft standard, they're in Palm.
13          That's a standard.  Palm's invention pertains
14   to any standard --
15          Q     Okay.
16   A     -- he said that himself.
17          Q     Okay.  So I think I heard two points.
18   The first is, in your view, the XDSL standards
19   themselves are the classes, at least under
20   Brandywine's construction.  Is that correct?
21   A     That's one possibility.
22          Q     Okay.  And the second possibility is
23   this passage here in Palm 442, is read to, in your
24   view, incorporates any existing standard including
25   the draft spectrum management standard at the time?
```

ANTHONY ACAMPORA
March 17, 2014

```
 1    A      Well, one is skilled in the art at the time
 2    of the filing of the '501 patent would have had
 3    access to Palm, would have had access to the draft
 4    standard, and would have said, well, in Palm, I
 5    could mix and match.  I could choose from among
 6    existing DSL standards.  That would be my set of --
 7    the second set could be the spectrum management
 8    classes as they existed in the draft standard, which
 9    were known for some of the DSL, some of the -- some
10    from the draft standard, the collection of both, all
11    of these would have been possibilities.
12         Q      Okay.  I just want to get that
13    straight.
14              MR. REED:  Counsel, we've going for
15    about an hour, is now a good time for a break?
16              MR. SUN:  Could we do -- yeah, let's
17    take a break.
18              So ten minutes?
19         (Recess taken at 10:56 a.m.)
20         (Back on the record at 11:20 a.m.)
21    BY MR. SUN:
22         Q      Welcome back, Doctor Acampora.
23    A      Okay.
24         Q      So I think before the break we were
25    talking about Palm --
```

**ANTHONY ACAMPORA**
**March 17, 2014**

1  A      Yeah.

2        Q      -- and we were on page 43 of your

3  report there, and I believe you stated that the XDSL

4  standards themselves disclosed the spectrum

5  management classes for Palm?

6  A      Yeah, under Brandywine's construction, I

7  believe that's the case.

8        You know, it's really quite clear in Palm.  I

9  gave you one example in column 4.  There's a second

10 example I can give, if you give me a moment, in

11 column 2, where Palm speaks of -- and this is

12 column 2 beginning at line 59, "A communication

13 control session executes a handshake procedure

14 (protocol) in negotiation channel to obtain

15 information containing high-speed data

16 communications, including type identification

17 information of XDSL used in communication exchange.

18 A communication standard refers to any standard,

19 whether de facto, proprietary or issued by an

20 industry or government body."

21       So, once again, the Palm technique consists

22 of measure a channel, choose an appropriate scheme

23 based upon those measurements.  That appropriate

24 scheme would conform with the standard.  It could be

25 any of the XDSL standards.  It could be any

**ANTHONY ACAMPORA**
**March 17, 2014**

1    communication standard, any type of standard.  It

2    could be de facto, proprietary or issued by an

3    industry or government body, including what existed

4    at the time of the filing of the '501 patent, the

5    draft spectrum management class standard.  Each of

6    those, defined in that standard, were a set of

7    schemes, the intent being measure the channel, pick

8    a scheme.

9         It's all right there.

10        Q    Okay.  So at least what an XDSL

11   standards -- are the XDSL standards themselves

12   spectrally compatible amongst each other?

13   A    Well, I'm not sure what you mean by that,

14   "spectrally compatible amongst each other."

15        They certainly -- the masks certainly

16   recognize that other -- recognize the possibility of

17   cross talk and interfering with other services using

18   the copper wire in the same bundle.

19        Q    But for standards such as CDSL, ADSL,

20   VDSL, are they guaranteed to not generate excessive

21   cross talk when they're in the same binder?

22             MR. REED:  Objection to form.

23   A    There are no guarantees at all, even if we

24   look at the current day spectrum management class

25   standards, that are no guarantees.

ANTHONY ACAMPORA
March 17, 2014

```
 1          Q     Is there some definition of spectral

 2    compatibility across all of these DSL standards?

 3                MR. REED:  Same objection.

 4    A     I guess I don't understand the question.

 5          Q     Is there some document defining

 6    acceptable levels of cross talk across these various

 7    DSL standards?

 8    A     I'm not sure if there is any, nor is there

 9    any necessarily, as I explained earlier, in the

10    spectrum management class standard as it exists

11    today, unless an earlier DSL made its way into the

12    basis set.

13          The intent was to ensure compatibility with

14    the basis set of any new type of service that might

15    be offered.  And unless that new service itself

16    happened to be a DSL-type service and found its way

17    into the basis, no guarantee -- and I'm using the

18    word "guarantee" in a very, very loose sense.  As I

19    said earlier, there are no guarantees.  The intent

20    is to make it unlikely.  Unlikely, I think the

21    objective is 1 percent likelihood that there would

22    be unacceptable interference from a new service into

23    a basis -- into any of the basis services.

24          And, you know, one thing the DSL does,

25    clearly, all DSL, it respects voice.
```

**ANTHONY ACAMPORA**
**March 17, 2014**

1       Q     So just focusing on the DSL varieties
2   of services, is there some notion of spectral
3   compatibility -- spectral compatibility across each
4   of these services?
5                MR. REED:   Object as to form.
6   A     I don't know what you mean by "some notion
7   of."
8            As I said, these standards -- the masks all
9   recognize the possibility of cross talk.  But, by
10  the way, I don't see that Brandywine's proposed
11  construction is limited to DSL data transmission
12  equipment.  Seems there's other nearby data
13  transmission equipment.
14           And for sure, the DSL standards all recognize
15  the possibility of interfering with voice band data
16  equipment, and what's done is real simple, they
17  don't transmit in the same frequency band.
18           So, yeah, that -- it's there, the standards
19  include -- Brandywine proposed constructions would
20  include the preexisting DSL standards.
21       Q     So just setting aside your
22  understanding of Brandywine's construction for the
23  moment, going back to what Nick Burd had in his
24  report, that the various classes are spectrally
25  compatible -- are considered spectrally compatible,

**ANTHONY ACAMPORA**
**March 17, 2014**

```
 1    just taking that statement on its face, are the
 2    various XDSL standards spectrally compatible?
 3                MR. REED:   Object as to form.
 4    A       You're asking are they?
 5            Q     Yes.
 6    A       I don't know what you mean by "spectrally
 7    compatible."
 8            Can they coexist in the same binder?
 9            Q     Sure.
10    A       Do they coexist in the same binder?
11    Absolutely.
12            Q     Is there a standard defining acceptable
13    level of cross talk across all of the different DSL
14    types?
15    A       Can I see the existing -- or any version --
16    any issued spectrum management class standard?
17            Q     No, I don't have it.
18    A       Then I can't answer your question.
19            Q     So that's not something you considered
20    when you pointed to spectrum management -- or the
21    DSL services at spectrum management classes in Palm.
22    A       I applied Brandywine's proposed construction
23    for spectrum management classes, and I already gave
24    my opinion on that, the DSL standards would comply
25    with that construction.
```

ANTHONY ACAMPORA
March 17, 2014

```
 1          Q     But you didn't consider the requirement
 2    that the DSL standards have to be spectrally
 3    compatible with each other?
 4    A       I didn't say that.
 5          I already told you, I think that there is a
 6    notion in all those standards that there is a
 7    recognition built into all of those standards of the
 8    possibility of cross talk.
 9          Q     So then what does it mean for multiple
10    DSL services to be spectrally compatible, in your
11    opinion?
12    A       They can coexist in the same binder.
13          Q     Okay.  With that understanding, do you
14    think that varies DSL services are spectrally
15    compatible?
16    A       Yes.
17          Q     Can two DSL services ever generate
18    excessive cross talk?
19    A       What do you mean by that?
20          Q     So in the same binder, can two DSL
21    services be deployed in a way that generates
22    excessive cross talk?
23    A       I don't know what you mean by "excessive
24    cross talk."
25          Q     Is there -- so there is no document
```

ANTHONY ACAMPORA
March 17, 2014

```
 1   describing what is acceptable level of cross talk
 2   across the DSL services.  Is that correct?
 3   A     I need to see the spectrum management class
 4   standard -- any spectrum management class standard
 5   to answer that question, but I believe the answer to
 6   the question is there is.
 7         Q     Putting aside this issue of spectrum
 8   management class standard, for the XDSL standards
 9   themselves per se, is there some definition of there
10   being XDSL standards that devise an acceptable level
11   of cross talk.
12   A     Can I see an XDSL standard.
13         Q     To your knowledge, is there anything
14   like that?
15   A     I don't recall.  I actually -- what I do know
16   is that all these masks took into account possible
17   excessive cross talk as well, as well as there's a
18   phrase that's actually used in these documents, I
19   think it's "foreign cross talk."  There's self cross
20   talk and there's foreign cross talk.
21         Q     Okay.  Is it fair to say you didn't
22   consider Nick Burd's requirement that the classes be
23   equally spectrally compatible when you analyzed the
24   Palm reference?
25                   MR. REED:  Object as to form.
```

ANTHONY ACAMPORA
March 17, 2014

```
 1   A       Yeah, that's -- I actually -- well, first, I
 2   didn't have his report available.  So did I take
 3   into account exactly what he said?
 4           Well, I already told you I don't even agree
 5   with what he said, I don't even necessarily
 6   understand what he said, except by providing my
 7   interpretation of what he might mean, you guided me
 8   through a whole bunch of questions earlier, and we
 9   came to a conclusion if that's what he meant, well,
10   in that very limited sense I could agree with that,
11   but that did I consider spectral compatibility?
12           I did in applying -- in performing my
13   analysis.  What I applied was Brandywine's proposed
14   construction.
15           Brandywine's proposed construction says
16   nothing about the other data transmission equipment
17   being DSL.  I even considered that, but for sure --
18   and I gave you an example just a few minutes ago --
19   all DSL standards respect and are designed to
20   minimize interference with voice band data for sure.
21           So it's completely consistent with
22   Brandywine's construction.
23       Q       But across the various DSL services
24   themselves, is there assurance of spectral
25   compatibility?
```

ANTHONY ACAMPORA
March 17, 2014

```
 1   A      Brandywine's construction does not require
 2   that.  Let me just point that out to begin with.
 3          So you're asking if we further limit
 4   Brandywine's proposed construction, and even further
 5   than it is, so that nearby data transmission
 6   equipment reads nearby DSL data transmission
 7   equipment.
 8          Q      I'm not asking about the -- your
 9   understanding of Brandywine's construction, but just
10   for the XDSL standards themselves, which you point
11   to as being classes, are they spectrally compatible
12   with each of these?
13   A      Well, they're classes as -- if I applied
14   Brandywine's construction, they're classes.  I mean,
15   I told you why.  I also told you that it's not just
16   those, but even the draft spectrum management
17   classes would fall under Palm, because it was the
18   clear language in Palm where he's referring to
19   any -- any standard, de facto, proprietary, issued,
20   and so forth.
21          So I guess I'm still not sure what you're
22   asking.  You're asking to take a -- I think you're
23   asking to take a very narrow subset, let's ignore
24   everything and play a game, the game being, let's
25   consider only DSL standards, the existing DSL
```

ANTHONY ACAMPORA
March 17, 2014

```
 1   standards, is there a notion of spectral
 2   compatibility built into those standards?
 3          In my opinion, the answer is yes.
 4          Q     So is that the same notion of spectral
 5   compatibility that's described -- so -- strike that.
 6          So the issued standard, T1.417, there
 7   is a definition of spectral compatibility, because
 8   the classes are understood to spectrally compatible
 9   if the surface falls within the requirements of
10   those classes, correct?
11   A      I believe that is not true.
12          Q     Okay.
13   A      There was a notion of spectral compatibility
14   basis set.  Each class is spectrally compatible with
15   every member of the basis set.  That's true.
16          Q     Okay.
17   A      And if a DSL happens to be one of the basis
18   sets, then a different spectrum management class
19   would be spectrally compatible with it as well.
20          Q     So -- okay.  If we can go to page 62.
21   A      Of?
22          Q     Of your report.
23          It begins your analysis of McHale and
24   the '501 patent there?
25   A      Yes.
```

52

ANTHONY ACAMPORA
March 17, 2014

1          Q      If you look on page 65.

2                 Just the last paragraph on page 65,

3     just take a moment to read that.

4     A      Just want to put it into some context, if I

5     can read that as well.

6          Okay.

7          Q      Okay.  So on McHale, on page 65, you're

8     beginning your analysis again with spectrum

9     management classes.

10                What are you pointing to as spectrum

11    management classes in McHale?

12    A      Multiple DSL standards.

13         Q      Okay.  And that's for the same reason

14    as we talked about with Palm, correct?

15    A      That's correct.

16         Q      Anything else you're pointing to as

17    spectrum management classes in McHale?

18    A      Can I see McHale?

19         Q      Okay.

20                MR. SUN:  Marking as Exhibit 6, a copy

21    of the McHale reference.

22         (Exhibit received and marked EXHIBIT 6 for

23         identification.)

24                THE WITNESS:  Thank you.

25                Yes.

ANTHONY ACAMPORA
March 17, 2014

```
 1    BY MR. SUN:
 2          Q     Okay.  Can you point me to what else
 3    you're pointing to as spectrum management classes in
 4    McHale?
 5    A     "Ethernet, fast ethernet, V.35, data
 6    protocol, frame relay, asynchronous transfer mode
 7    (ATM), switched multi-megabit data services (SMDS),
 8    high level data link control (HDLC), serial line
 9    internet protocol (SLIP), point-to-point protocol
10    (PPP), transmission control protocol/internet
11    protocol (TCP/IP), or any other appropriate
12    protocol, collectively referred to as a digital
13    protocol."
14          There may be more.
15          Q     So that was from column 3 of line 45,
16    those words?
17    A     Yeah.  It's basically footnote 88 to my
18    report.
19          I think that may be it but I can give more if
20    you'd like.
21          Q     Oh, no, that's fine.
22    A     Okay.
23          Q     So the list you just mentioned, in your
24    opinion, all of these data communication protocols
25    are considered spectrum management classes?
```

ANTHONY ACAMPORA
March 17, 2014

1    A       Under Brandywine's construction, they were

2    all requirements for data transmission equipment

3    designed to minimize interference with other nearby

4    data transmission equipment, yes.

5            Q       Are they all mutually spectrally

6    compatible?

7    A       What do you mean by "mutually spectrally

8    compatible"?

9            Q       That there's some standard defining

10   what the level of cross talk -- defining what would

11   be an excessive level of cross talk between these

12   protocols?

13   A       I'm not sure I understand the question.

14           Is there a standard?  These are all -- each

15   of these is defined by its own standard.

16           Q       Is there a separate document or within

17   these standards that defines the acceptable level of

18   cross talk between two or multiple of these

19   protocols?

20                   MR. REED:  Object as to form.

21   A       Can I see what -- well, you already told me

22   that you don't have a copy of any of these.

23           Q       Correct.  But just to your knowledge.

24   A       You're asking does any one of these standards

25   by itself include a definition of excessive cross

ANTHONY ACAMPORA
March 17, 2014

```
 1   talk?
 2          Q      Correct.
 3                 Strike that.
 4                 MR. REED:  I'm sorry.
 5                 MR. SUN:  He's about to answer.
 6   A      And you're asking to another -- cross talk to
 7   what?
 8          Q      To -- from one -- between two
 9   protocols, is there a document quantitively defining
10   an acceptable level of cross talk between two or
11   more of these protocols?
12   A      Define "acceptable level of foreign cross
13   talk."  That is what you're asking.
14          Q      Just specifically across different
15   communication protocols.
16                 MR. REED:  Object as to form.
17   A      I'm not sure I could answer that question,
18   because it might even be application dependent.
19                 So, many of these schemes are adaptive
20   schemes where the modulation will be adaptively
21   updated in such a way as to protect the application
22   being supported, and in so doing, avoid interfering
23   with an adjacent service that it itself avoided by
24   choosing the particular modulation scheme used.
25          Q      So what you're saying is there's some
```

ANTHONY ACAMPORA
March 17, 2014

```
 1    attempt to address cross talk with other protocols.
 2              And my question is:  Is there a
 3    quantitative definition of what deployment -- what
 4    deployment requirements may be understood to not
 5    generate an excessive amount of cross talk?
 6    A     Okay.
 7              MR. REED:  Object as to form.
 8    A     At what point in time?
 9         Q     Any point in time.
10    A     I'd have to look at the standard.
11         Q     But, to your knowledge, there is no
12    such definition within the body of these standards
13    themselves?
14    A     Yeah, I'm not sure I'm saying that either,
15    but let me look at the standard.  There very well
16    may be.
17         Q     Okay.
18    A     I mean, there are other things that I'm
19    thinking about, but I'm not sure if -- I don't know
20    for certain that it's that.
21         Q     Okay.  So, off the top of your head,
22    you don't know if they're there?
23    A     I need to look at the standards.
24         Q     Okay.
25    A     But, by the way, my analysis I don't think is
```

ANTHONY ACAMPORA
March 17, 2014

```
 1   predicated upon that.  My analysis, once again, is
 2   predicated on Brandywine's proposed construction.
 3          Q     Understood.  Understood.
 4                Okay.  You can put McHale aside.  And
 5   if you'll flip to -- go back to your report.
 6   A     Give me a second, it's getting a little messy
 7   over here.
 8          Q     Your report, page 86.
 9                Here is where your analysis of Brown
10   begins, correct?
11   A     Yes.
12          Q     Okay.  And then if you flip to page 88,
13   and then on to 89, here is where you're discussing
14   how Brown discloses spectrum management classes,
15   correct?
16   A     Correct.
17          Q     And so what in your opinion in Brown
18   discloses spectrum management classes?
19   A     Can I get a copy of Brown?
20          Q     Sure.
21   A     Thanks.
22          Q     Exhibit 7 is a copy of the Brown
23   reference.
24                (Exhibit received and marked EXHIBIT 7 for
25                identification.)
```

ANTHONY ACAMPORA
March 17, 2014

```
 1                THE WITNESS:  By the way, all of the
 2    standards -- all of the XDSL standards do include a
 3    power spectrum density mask and a power of -- total
 4    power of constraint, and for sure these -- these
 5    would -- the imposition of both of these constraints
 6    would tend to avoid interference.
 7                It's not the case that -- it's
 8    certainly not the case that if I can't communicate,
 9    I could arbitrarily raise my power level as high as
10    I need to to ensure that my communication is
11    successful.  It was recognized very early that would
12    destroy communications in adjacent -- in subscriber
13    lines included in the same bundle.
14                So there's always been a recognition of
15    the effect of -- in all of these standards of the
16    potential for interference with someone else.
17    That's always there.
18    BY MR. SUN:
19        Q     So we can talk about that after you
20    tell me what discloses spectrum management classes
21    are disclosed in Brown.
22    A     In the XDSL standards.
23        Q     Okay.  Thank you.  That's just for the
24    same reasons we discussed before in McHale and Palm,
25    correct?
```

ANTHONY ACAMPORA
March 17, 2014

```
 1    A       At least for those reasons, yes.
 2           Q      Anything more in Brown that you're
 3    pointing to as spectrum management classes?
 4    A       Yeah.  If we look at Brown, column 2,
 5    lines 42 through 48, "Designing a DSL driver to
 6    account for the worst-case scenario, only -- not
 7    only wastes power on short lines, but can also
 8    introduce excessive near-end cross talk (NEXT), in
 9    adjacent subscriber lines.  Because the subscriber
10    lines generally tend to be concentrated in the
11    central switching office, any driver dissipating
12    excess power can cause additional unwanted
13    interference in the nearby subscriber lines."
14           Let me go on just a little bit further, "The
15    present invention is directed to overcoming or at
16    least reducing the effects of one or more of the
17    problems set forth above."
18           In our context, one of those problems set
19    forth above is cross talk.
20           Q      So what in that passage is the class,
21    or spectrum management class?
22    A       Well, applying Brandywine's claim
23    construction, any of the XDSL standards further
24    limited by Brown to drop the power level below the
25    maximum allowed when possible.
```

ANTHONY ACAMPORA
March 17, 2014

```
 1          Q      Is there anything else in Brown that
 2   refers to spectrum management classes?
 3   A       Not that I can see.
 4          Q      Okay.  If we could go to the next one,
 5   which is page 105.
 6                 So this is the etherloop modem,
 7   correct?
 8   A       Correct.
 9          Q      So I guess, first of all, I note that
10   all the footnotes in this section refers to the '501
11   patent.
12   A       Correct.
13          Q      Are you relying on just that
14   description of the etherloop modem in the '501
15   patent for analysis?
16   A       That's correct.
17          Q      Have you viewed any other documents for
18   the etherloop modem?
19   A       No.
20          Q      So the etherloop modem -- that
21   description of the etherloop modem was obviously
22   made known to the examiner when the patent was being
23   examined.
24                 Do you have any opinion as to why the
25   examiner was able to allow the claims over that
```

ANTHONY ACAMPORA
March 17, 2014

```
 1    description of the etherloop modem?
 2                    MR. REED:  Object as to form.
 3    A      Yeah, I'm not sure I understand the question.
 4           Q      Do you have any opinion as to why the
 5    claims were allowable, at least in the examiner's
 6    opinion, or not?
 7    A      I would need to look at the prosecution
 8    history to even attempt to assess what was in the
 9    examiner's mind.
10           Q      Did you consider this --
11    A      I do know that --
12           Q      Go ahead.
13    A      -- I do know that, in my opinion, the
14    etherloop modem, if we apply Brandywine's
15    construction for -- Brandywine's proposed
16    construction for all of the claims in dispute, and
17    in some cases AT & T's construction -- proposed
18    construction would completely invalidate the patent.
19           Q      But there's no opinion as to why the
20    examiner may have been wrong or -- in his or her
21    examination of the etherloop prior art?
22    A      I would need to look at the prosecution
23    history.
24           Q      But that opinion is not in the report?
25    A      I don't know.
```

ANTHONY ACAMPORA
March 17, 2014

1            I don't appear to have relied on the
2    prosecution history in forming my opinion in this
3    case.  I certainly was aware of it.  I read it.  And
4    I -- based upon what I read there, based upon a
5    reading of the patent in this case, I just used the
6    description of the etherloop modem taken from the
7    '501 patent itself and formed my opinions.
8            Q     Okay.  Thank you.
9    A       And, of course, applying both sides' proposed
10   claim constructions.
11           Q     Okay.  So if you look at page 106 to
12   107 of your report.
13   A       I'm there.
14           Q     There is a discussion on the etherloop
15   modem discloses spectrum management classes without
16   limitation?
17   A       Correct.
18           Q     Maybe you can just tell me what in the
19   etherloop modem discloses spectrum management
20   classes?
21   A       Well, this is a preliminary -- looking in my
22   report at page 106, line 20 --
23           Q     Okay.
24   A       -- I note that the applicants state that
25   "When an etherloop modem is operating properly, it

**ANTHONY ACAMPORA**
**March 17, 2014**

```
 1   will, under many circumstances, select modes of
 2   operation that are not in compliance with the
 3   aforementioned spectrum management classes."
 4          And then I go on to state, "This statement by
 5   the applicants, however, shows that the etherloop
 6   modem can, in some circumstances, operate in modems
 7   that do comply with ANSI spectrum management
 8   standard."
 9          Q     Okay.
10   A      And this means -- a point of clarification:
11   That is the draft standard referenced in the '501
12   patent.
13          Q     Okay.  Understood.
14   A      Now, that was just -- I wanted to -- I want
15   to fully answer your question.  That's part A.
16          Q     Sure.
17   A      Okay.  So how the etherloop modem operates is
18   by measuring interference on its line across the
19   band and then choosing a spectral range where there
20   was little interference.
21          By so doing, since the interference is
22   reciprocal, it would help to ensure that it was
23   "minimally" -- and I put that in quotes because it's
24   not a mathematical minimization, it's really more of
25   an avoidance.  So that will avoid the etherloop
```

ANTHONY ACAMPORA
March 17, 2014

```
 1   modem interfering with any other services using
 2   adjacent subscriber lines.
 3        And as I point out, the only thing that's
 4   left there is whether these are defined by the
 5   standard.  And there I think it would have been
 6   obvious to modify what's done in the modem to comply
 7   with the standard.
 8        Q    So, in your opinion, it was these
 9   ranges that are selected that are the classes?
10             MR. REED:   Object as to form.
11   A    That's correct.
12        Q    Are these ranges -- do you remember we
13   discussed earlier that the spectrum management
14   class, according to Dr. Burd, had to be a group of
15   requirements that are fixed and defined together?
16   A    Well, I remember we spoke about a lot of the
17   confusing aspects of what Dr. Burd wrote in his
18   report, so you're going to need to clarify what --
19   you're going to have to properly constrain your
20   question by exercising the confusing parts of what
21   Dr. Burd said.
22        Q    I just want to recall your memory to
23   that discussion.
24             And do you think these ranges that are
25   selected by etherloop modem, do they meet that
```

ANTHONY ACAMPORA
March 17, 2014

1    requirement, that these classes -- quote-unquote

2    classes meet that requirement from Dr. Burd's

3    report?

4    A       Okay.  Meet what -- I have the report in

5    front of me.

6           Q       I think it was on page 18 of Dr. Burd's

7    report, the second point, you said, "It is useful to

8    understand that 'spectrum management classes'

9    involve a collection of requirements, which are

10   defined fixed as a group."

11               Do you see that?

12   A       Yes.

13          Q       So did these ranges that are chosen in

14   the etherloop modem, do they involve a collection of

15   requirements that are defined and fixed as a group?

16   A       They could.

17          Q       How so?

18   A       It may very well be the case that there is a

19   set of let's say DSL services run in the same

20   binder, and the -- some of which were operational at

21   one point in time, some of which were operational at

22   a different point in time.

23               At any point in time this etherloop modem is

24   going to choose its operating spectrum in such a way

25   as to neither interfere with -- but it -- so as to

**ANTHONY ACAMPORA**
**March 17, 2014**

1    not be interfered with by whatever other services

2    might be sharing the same bundle, and in so doing,

3    avoid interfering with that other service.  If the

4    two servers are using different bands, they're not

5    going to interfere.

6         So depending upon -- and this would be

7    installation dependent -- which DSL services are

8    operational -- are operating at the time and not,

9    that will basically fix the set of spectra over

10   which the ethernet modem -- etherloop modem would

11   eventually settle.  That's a group.

12        Q    So when you say, "group," you're

13   talking about a group of bands, correct?

14   A    Well, I'm trying to use it as, I think,

15   Dr. Burd is using it here.  We had a discussion of

16   this a while back --

17        Q    Uh-huh.

18   A    -- so it would be this -- one class would

19   have a set of requirements, several classes would

20   have several sets of requirements.  Those sets,

21   plural, of requirements would be the group.  In that

22   case, these ranges would be the group.

23        And the power levels and the power spectrum

24   density over that range, that would be the group --

25   the set of those would comprise the group.

ANTHONY ACAMPORA
March 17, 2014

```
 1         Q     Does the etherloop modem also
 2    address -- to your knowledge, does it also address
 3    the power level across the ranges?
 4    A     Well, I don't know if it explicitly describes
 5    that.  I don't think that the '501 patent mentioned
 6    that, and as I already testified, I didn't review
 7    the -- anything outside of what was actually
 8    disclosed in the '501 with regard to etherloop.
 9         But if it's not explicitly there, it would be
10    overtly obvious that you would want to limit the
11    powers being sent both to avoid wasting power, and
12    also to avoid interfering.  If you don't need to
13    send as much power as you're currently sending to
14    communicate satisfactorily, drop the power level.
15    That's almost universally done.
16         Q     And, to your knowledge, the only thing
17    etherloop modem is adjusting is the frequency
18    ranges?
19    A     Well, the only thing that I'm certain it's
20    adjusting is the range of frequencies over which it
21    would operate.
22         But it would be obvious, with the reason I
23    said, to adjust the power, and also, the power
24    spectral density as well.
25         And when we say, "adjust the range of
```

ANTHONY ACAMPORA
March 17, 2014

```
 1    frequencies," implied in that is the spectral mass

 2    associated with that.

 3         Q     I'm going to turn to page 125.

 4               Here is your analysis of Palm in

 5    combination with the Greszczuk -- I'm not sure if

 6    I'm pronouncing that correctly.

 7               MR. REED:  G-R-E-S-Z-C-Z-U-K.

 8         Q     Greszczuk.

 9               Do you know this individual?

10    A     I do not.

11         Q     So I notice you have some combination

12    references where you've just seen one page or two,

13    you try to combine two references.

14               I guess let's just focus on Greszczuk.

15               What limitation is Greszczuk adding to

16    Palm or in this page?

17    A     Could I have a copy of Greszczuk?

18         Q     Sure.

19               MR. SUN:  This is Exhibit No. 8, a copy

20    of the Greszczuk reference.

21         (Exhibit received and marked EXHIBIT 8 for

22         identification.)

23    A     Okay.  So I think -- can I have the question

24    read back one more time?  Maybe I can answer without

25    reading any further.
```

**ANTHONY ACAMPORA**
**March 17, 2014**

```
 1            (Stenographer reads back as requested.)
 2    A      Okay.  So, I think that Palm stands on its
 3    own.  I have a section in my report dealing with
 4    Palm.  I applied both sides of claim construction,
 5    and I told you -- and I described in my report why I
 6    believe -- that where I think these claim
 7    limitations are met.
 8            Now, AT & T's construction for duality
 9    transceivers includes two or more hardware
10    transceivers available for connection, one at a
11    time, to the subscriber line.
12            I believe that that's disclosed in Palm.  But
13    be that as it may, Greszczuk clearly discloses
14    multiple hardware transceivers.  And it would be
15    obvious to combine Greszczuk with Palm.
16    Q      So Greszczuk is being combined for the
17    purposes -- for the purpose of meeting the plurality
18    of transceivers limitation under Brandywine's
19    construction?
20    A      Under AT & T's construction, which I believe
21    Palm disclosed by itself.  But if a find finder of
22    fact should -- well, if -- yeah, if a finder of fact
23    should find otherwise, I think that would be wrong,
24    but in that case, fill in the plurality transceivers
25    under AT & T's construction with Greszczuk.
```

**ANTHONY ACAMPORA**
**March 17, 2014**

1          Q       So Greszczuk meets AT & T's

2    construction of the plurality of transceivers?

3    A        That's correct.

4          Q       Is it your opinion that Greszczuk also

5    meets the plurality of transceivers limitation under

6    Brandywine's construction?

7    A        It would -- Brandywine's construction is

8    broader than AT & T's.

9          Q       So both construction of the plurality

10   of transceivers Greszczuk would disclose?

11   A        That's correct.  Not necessary to combine

12   Greszczuk with Palm, I think Palm meets the

13   plurality of transceivers limitation on its own

14   under either party's proposed construction.

15          But in any event, I use Greszczuk

16   specifically for the following situation:  If the

17   Court rules that AT & T's construction is correct,

18   and someone should ultimately conclude that Palm

19   doesn't include a plurality of hardware

20   transceivers, I think that would be a mistake if

21   somebody should draw that conclusion, then fill in

22   the missing element with Greszczuk.

23          And, in passing, I note, since you brought my

24   attention to it, Greszczuk would also meet the

25   plurality of transceivers under Brandywine's

ANTHONY ACAMPORA
March 17, 2014

```
 1    proposed construction because Brandywine's
 2    construction does not require one or more hardware
 3    transceivers but does involve a separate hardware
 4    unit for each transceiver or a separate software
 5    running on a single hardware unit, and Greszczuk has
 6    a separate hardware unit for each transceiver.
 7              Q     Okay.  Thank you.
 8                    So for the Greszczuk reference, does it
 9    disclose any spectrum management classes, in your
10    opinion?
11                    MR. REED:  Can I hear back the
12    questions, please.
13              (Stenographer reads back as requested.)
14    A      No, I'm not using Greszczuk in combination
15    with Palm to fill in a missing spectrum management
16    class requirement.
17                    I think Palm, we already spoke about that,
18    and I believe that's fully disclosed in Palm.  But
19    as it turns out, I believe that Greszczuk does as
20    well.  It's referring to two different well-known
21    voice band modem standards, V.32 and V.22.
22                    And applying Brandywine's construction to
23    spectrum management class, I think that would
24    actually fit under -- would fit the requirements.
25    Those are the requirements, V.32 requirements, V.22
```

ANTHONY ACAMPORA
March 17, 2014

```
 1   requirements.  The data transmission is designed to
 2   minimize interference with other nearby data
 3   transmission equipment.
 4          Other versions of itself, which Brandywine's
 5   construction actually allows, it doesn't need to be
 6   a different type of equipment, it could be the same
 7   type of equipment, a different type of equipment, it
 8   could even be voice.
 9          Q      Okay.  Anything else that can be
10   considered spectrum management classes, in your
11   opinion, in Greszczuk?
12   A      Well, like I said, I wasn't specifically
13   looking for that.  If you'd like, I could read the
14   whole thing and see if there is anything else.
15          Q      I'm just talking about what your
16   opinion is that you've set forth in your report.
17   A      Well, I already said, in my report, I didn't
18   offer an opinion on whether Greszczuk disclosed
19   spectrum management classes.
20          I used Greszczuk in combination with Palm
21   only for that one specific case that we already
22   discussed.  But since you asked me about it here
23   today, I can now tell you that I had read an opinion
24   that Greszczuk does disclose under Brandywine's
25   construction spectrum management classes for the
```

ANTHONY ACAMPORA
March 17, 2014

```
 1    reasons I gave.
 2          Now, you're asking are there any other
 3    reasons, and I'd have to look -- I'd have to read
 4    Greszczuk to see if they have some other reasons as
 5    well.
 6          Q     Why don't you go ahead and let me know
 7    if there's any other things you can point to as
 8    spectrum management classes.
 9    A     Sure.
10          Q     So, Dr. Acampora, have you found any
11    other disclosures of spectrum management classes is
12    the question.
13    A     Not yet, but I haven't finished reading it.
14          Q     Oh, Okay.
15    A     I just paused while you were having your
16    discussion.
17          Well, not that I can see here, above and
18    beyond what I already mentioned, but to be
19    completely thorough, I would need to look at the
20    V.32 and V.22 modem standards.
21          Q     Okay.  Understood.
22          Okay.  So just one last question and
23    then we'll take a break.
24          So there's, on page 126 of your report,
25    there's a picture.  It's comparing a diagram in Palm
```

**ANTHONY ACAMPORA**
**March 17, 2014**

1    with the diagram in Greszczuk.

2    A      Yes.

3           Q      Are you -- are you -- is this picture

4    an attempt to combine two references?

5    A      Correct.

6           Q      And I see you point to, on the bottom

7    figure, which is Greszczuk, you point to 12, 14, 20

8    and 24 as transceivers?

9    A      Well, to be specific, 12 and 20 comprise a

10   transceiver and 14 and 22 comprise a different

11   transceiver.  So the V.32 transceiver and the V.22

12   transceiver.

13          Q      Thank you.  So the box itself, 12, is

14   labeled "modulator."

15   A      Correct.

16          Q      What is a modulator?

17   A      Modulator is what -- well, are you asking for

18   everything that's inside of that box or just in

19   general what is modulator?

20          Q      In general but consistent with

21   modulator here.

22   A      Okay.  This box includes -- not limited to,

23   but includes -- equipment that would actually take a

24   digital bit stream on one side and create an analog

25   wave form representative of that digital bid stream

ANTHONY ACAMPORA
March 17, 2014

1    on the other side.

2         Q     And the demodulator does the opposite

3    of what you just described?

4    A     Well, the demodulator, that -- each of the

5    demodulator boxes includes at least equipment that

6    would accept the analog wave form on one side, and

7    attempt to recreate the underlying digital bit

8    stream corresponding to the bit stream that was used

9    at the far end modulator to create that analog wave

10   form, the channel then distorting the wave form in

11   many, many ways before it actually arrives at the

12   receiver.

13        Q     Okay.  Can parts of the modulator be

14   implemented in software?

15   A     Well, okay --

16             MR. REED:  Object as to form.

17   A     The following would be true:  If we looked at

18   box 12 and box 14, inside those boxes there may very

19   well be some software involved.  But that would not

20   be common software.  It would be a separate hardware

21   modulator/demodulator in 12 distinct from the

22   separate hardware modulator -- I'm sorry, the

23   separate hardware modulator in 12 separate from the

24   hardware modulator in 14, two separate pieces of

25   hardware.

ANTHONY ACAMPORA
March 17, 2014

```
 1          Now, there may be -- as I understood your
 2    question, there may be some software inside of box
 3    12, there may be some software inside of box 14, but
 4    that's not shared software, and who knows what
 5    function that might perform.
 6          Q     Okay.
 7    A     All right.  And I might make comparable
 8    statements for boxes 20 and 22.
 9          Q     Okay.  And then box 16, it says,
10    "Telephone line interface."
11               Do you see that?
12    A     Yes.
13          Q     What function does that box serve?
14    A     Well, as its name suggests, that's what
15    couples the signal produced by one of the two
16    modulators, one chosen by switch, and places that
17    signal on to the telephone line, and in the opposite
18    direction, it accepts the signal coming from the
19    telephone line and distributes it to the two
20    demodulators.  There's a switch shown there at the
21    output side of the demodulator that would select one
22    of the two outputs and feed it to the DTE interface.
23          The DTE interface is the digital equipment --
24    digital terminal equipment.
25          Q     So in this figure, the two sets of
```

ANTHONY ACAMPORA
March 17, 2014

```
 1   modulator/demodulators, they're sharing one
 2   telephone line interface?
 3   A     Not at the same time, but yes.
 4        Q     And this telephone line interface would
 5   be a single port?
 6   A     What do you mean by "single port"?
 7        Q     So if we look at Greszczuk -- if we
 8   look at column 2, line 5, it says, Figure 1 is a
 9   modem, a multimode modem.
10            And so does that tell you that the
11   telephone line interface 16 is a single port to the
12   telephone line?
13   A     Well, I'm assuming what you mean by single
14   port, because this caption, Figure 1 caption, is
15   revealing exactly what I just said.
16        Figure 1 is a modem.  That modem has two
17   transceivers in it -- two physically different
18   hardware transceivers inside of it along with
19   equipment that allows the appropriate modem to be
20   selected and coupled -- the appropriate transmit
21   receiver pair to be selected and coupled with the
22   DTE on one side and fed -- and coupled to the
23   telephone line on the other side, and to accept
24   digital information from the DTE on one side and
25   funnel the correct analog signal to the telephone
```

ANTHONY ACAMPORA
March 17, 2014

```
 1    line on the other side.

 2         Q    Uh-huh.  Do you consider the telephone

 3    line interface part of the transceiver?

 4    A    It's almost a peripheral question, but I

 5    think if I had to form an opinion on this peripheral

 6    question, I would say it's part of the transceiver.

 7    It's a device and the telephone line plugs into it.

 8         Q    So how many transceivers do we have in

 9    Figure 1, is it two or is it one transceiver?

10    A    In Figure 1?

11         Q    Or the Greszczuk figure.

12    A    Yeah, the Greszczuk Figure 1, there are two

13    transceivers.  One modem, two transceivers.

14         Q    Okay.

15    A    And I said the telephone line is part of the

16    modem.  I didn't say it was part of the transceiver,

17    I said it was part of the modem.  I wanted to be

18    sure I answered the question I thought I heard.

19         Q    Right.  Could you repeat that?

20    A    Yeah.  The telephone interface -- and, again,

21    this is a peripheral matter, but I would regard the

22    telephone line interface to be part of the modem --

23         Q    Modem.

24    A    -- not part of either of the two

25    transceivers, part of the modem.
```

**ANTHONY ACAMPORA**
**March 17, 2014**

```
1          Q      So in your interpretation, the

2    telephone line interface is not part of the

3    transceiver?

4    A      It is not part of the transceiver.

5          Q      So there are two totally separate

6    transceivers?

7    A      Two totally separate transceivers, correct.

8                 MR. REED:  Okay.  We can take a break

9    for lunch.

10                (Luncheon recess taken at 12:40 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

ANTHONY ACAMPORA
March 17, 2014

```
 1              A F T E R N O O N   S E S S I O N
 2    BY MR. SUN:
 3         Q     Welcome back, Doctor Acampora.
 4    A     Thank you.
 5         Q     So let's now go to the next reference
 6    in your report, which was on page 127.
 7                   MR. SUN:  And we'll mark this as
 8    exhibit...
 9         (Exhibit received and marked EXHIBIT 9 for
10         identification.)
11    BY MR. SUN:
12         Q     This is a copy of the reference to
13    Eichen, or Eichen.
14                   MR. REED:  I suspect it's Eichen.
15                   MR. SUN:  Eichen.  Okay.
16         Q     So, on page 129, there's, again, a
17    discussion of how spectrum management classes are
18    disclosed by Eichen.
19                   Do you see that?
20                   And just take a moment to read that.
21                   Okay.  So I guess my first question is:
22    What in Eichen discloses spectrum management classes
23    in your opinion?
24    A     A few things.  So, again, this is applying
25    Brandywine's proposed construction.
```

ANTHONY ACAMPORA
March 17, 2014

```
 1          If I look at my report, page 129, line 9, for
 2     example, Eichen discloses, "A method for qualifying
 3     a twisted pair loop for a digital subscriber
 4     service," which includes "determining whether the
 5     digital subscriber service is spectrally compatible
 6     with other services on other cabled pairs in the
 7     shared binder group."
 8          So, clearly, Eichen is concerned with
 9     determining loop conditions and of further
10     determining whether the digital subscriber service
11     is spectrally compatible with other services that
12     share the same binder group.
13          Eichen then goes on to mention various XDSL
14     standards, and each of those includes a power
15     spectral density requirement.  So at least the power
16     spectral density -- and this is all from my report,
17     by the way.
18          "At least the power spectral requirements and
19     average transmit power limitations in the various
20     XDSL standards defined requirements for data
21     equipment designed to minimize interference with
22     other nearby data transmission equipment."
23          So Eichen is about choosing or qualifying a
24     line for a particular type of DSL service accounting
25     for interference or spectrum compatibility with
```

ANTHONY ACAMPORA
March 17, 2014

```
 1    other services in the same cabled pair.
 2          Q     Okay.  So spectrum management classes
 3    in Eichen, are they DSL standards?
 4    A     That's one example.
 5          Q     And I know you mentioned that Eichen is
 6    attempting to determine whether digital subscriber
 7    services is spectrally compatible.
 8                Do you know how it does that?
 9    A     How it does that?
10          Q     Yeah.
11    A     Well, we can go into this in as much detail
12    as you'd like, but in general, it's through a
13    combination of line measurements and database
14    lookup.
15          Q     So in that process -- so just strike
16    that.
17                What is ultimately chose or qualified
18    in the Eichen reference?
19                MR. REED:  Object as to form.
20    A     Okay.  So what Eichen is qualifying, Eichen
21    reads -- and this is -- I'm quoting from my own
22    report here, but I'm taking this out of -- out of
23    Eichen.
24                Eichen is disclosing the qualifying of the
25    digital loop for XDSL service, but if we look in
```

ANTHONY ACAMPORA
March 17, 2014

```
1    Eichen at column 2 beginning at line 63, so the loop
2    is being qualified in the following way:  "The
3    present invention" -- and, by the way, this is cited
4    in my report.
5         "The present invention satisfies those
6    desires by providing the system and method for
7    qualifying a twisted pair copper loop for digital
8    subscriber loop services.  The system automatically
9    queries telecommunication provider database records
10   and/or requests measurements from network switching
11   equipment or testing systems to obtain information
12   regarding the twisted pair copper loop in question.
13   The system then determines which digital subscriber
14   loop services are available for the copper loop
15   based on the combination of all information
16   obtained."
17        So let me rephrase what I just read and put
18   it in my words.
19        Eichen is about consulting the database,
20   making line measurements, and determining which XDSL
21   services -- and he actually lists a whole bunch in
22   column 1, ADSL, VDSL, HDSL, SDSL, IDSL, RADSL.  So
23   based upon the database query and line measurements,
24   determined which of these DSL services this loop can
25   support ensures that -- well, with an eye toward
```

ANTHONY ACAMPORA
March 17, 2014

```
 1    avoiding spectral -- avoiding interference with

 2    other usages in the same binder.

 3           That's what Eichen is about.

 4           Q     So during the qualification process,

 5    does Eichen ever compare the loop -- the loop data

 6    that measures against the fixed set of parameters?

 7    A      Well, yeah, it does.

 8           Q     So what is it -- where is that

 9    discussed?

10    A      Well, in what I just mentioned.  And, again,

11    we can go on, again, in as much detail as you'd

12    like, but in the passage I just read, beginning in

13    column 2, at line 63, and ending in column 3, line

14    5, and I'm also going to include this list of DSL

15    types appearing in column 1 of Eichen and run down

16    that list.

17           Knowing the power spectrum density, power

18    levels, other attributes of these different DSL

19    services, Eichen is determining, based on the

20    particular line in question, which of these can be

21    supported in a way as to not unacceptably degrade by

22    virtue of cross talk other services being carried on

23    a different twisted pair subscriber loop in the same

24    loop -- in the same binder.

25           Q     So, therefore, any opinion XDSL
```

**ANTHONY ACAMPORA**
**March 17, 2014**

1    standards are acting as the spectrum management

2    classes in Eichen?

3    A       Under Brandywine's construction, that is

4    correct.

5            Under Brandywine's construction, spectrum

6    management class, to be specific, that is correct.

7            Q       Okay.  Is there anything else within

8    Eichen that discloses to you spectrum management

9    classes other than the XDSL standards?

10   A       Well, yes.  I mentioned DSL and the alphabet

11   super of DSL types that were specifically called out

12   in column 1 of Eichen.

13           But just as an example -- and there were

14   other instances of this sprinkled throughout the

15   Eichen patent -- if we look at claim 2 of Eichen,

16   column 8, "The methods of claim 1 further comprising

17   determine whether the digital subscriber service is

18   spectrally compatible with other services on the

19   other cabled pairs in the shared binder group."

20           So I don't think that the digital subscriber

21   service being considered is necessarily limited to

22   DSL.  It could be any digital subscriber service.

23           Q       Uh-huh.  Anything else that discloses

24   spectrum management classes?

25   A       Yeah.  The allowable ANSI spectrum management

**ANTHONY ACAMPORA**
**March 17, 2014**

1    classes under Brandywine's construction and how

2    Brandywine has asserted its claims, I think that

3    they would all be covered.

4         Q     Is that disclosed in Eichen or are you

5    just mentioning that?

6    A     Well, no, I think it's disclosed in Eichen.

7    Eichen -- and here I'm going back to my report --

8    Eichen discloses qualifying -- I'm reading from my

9    report on page 130 about somewhere between line 10

10   and 11.

11        "Thus, as Eichen discloses, qualifying a

12   twisted pair loop for a digital subscriber service

13   generally, for a person skilled in the art, would

14   understand that Eichen necessarily discloses

15   qualifying the loop with respect to any standard

16   related to loop qualification for digital subscriber

17   service."

18        That's what Eichen is about, and that would

19   include -- and as I state right in my report, this

20   would include identifying allowable ANSI spectrum

21   management classes.

22        So it's clear that Eichen is concerned with

23   spectrum management.  It's clear that spectrum

24   management classes that Eichen considers includes

25   the various DSL standards -- and, again, this is all

ANTHONY ACAMPORA
March 17, 2014

1    under Brandywine's proposed construction and how

2    they've asserted the claims, but it would also

3    include the ANSI spectrum management classes which

4    consist of a group -- we used this phrase earlier --

5    of sets of constraints that are all -- have all been

6    proven to be spectrally compatible by means of

7    analysis and -- actually, all shown to be spectrally

8    compatible with a basis set on the basis of -- not

9    necessarily each other, we discussed earlier, but

10   with a basis set as determined by simulations and

11   calculations prescribed by -- those simulations and

12   calculations prescribed by ANSI spectrum management

13   standards.

14        Q     So before the issued T1.417 standard

15   came along, there were some XDSL standards already

16   in existence, right?

17   A     That's correct.

18        Q     In your opinion, what does the T1.417

19   standard add over the existing XDSL standards?

20   A     Can I have the standard, please?

21             MS. DAVIS:   I object as to the form.

22        Q     Just from your understanding.  I don't

23   have the standard.

24   A     Well, what do you mean by -- just ask the

25   question again.

ANTHONY ACAMPORA
March 17, 2014

```
1          Q     So why -- what did the T1.417 spectrum
2    management standard have over the existing XDSL
3    standard at the time?
4               MR. REED:   Same objection.
5    A     Add to what?
6          Q     A function.  A function.  The purpose.
7    A     The purpose of what?
8          Q     Of the standard.
9    A     You're asking what is the purpose of the
10   standard?
11         Q     Correct.
12   A     Okay.  So that's a totally different question
13   than the earlier one when you asked something about
14   what does it add relative to something that came
15   earlier.
16            So if you're asking what is -- what is the
17   standard all about, in my words, standard is about
18   defining a basis set of services prescribing
19   calculations that get performed on a new service
20   that is being considered for use over subscriber
21   line, and on the basis of those calculations,
22   constraining the particular new service by defining
23   parameters such that if that new service is offered
24   in conformance with those parameters, with
25   99 percent confidence, there will not be
```

ANTHONY ACAMPORA
March 17, 2014

```
 1   unacceptable interference into any of the basis set.
 2        When the next new service comes on line, or
 3   let's say -- let's say when the next new service
 4   comes on line, same process would need to be
 5   repeated, and as the set of allowable requirements
 6   develops when a new service is being offered, a
 7   check could further be made -- before going through
 8   these exhaustive calculations, a check can first be
 9   made, does this new service conform with any of
10   these requirements?
11        If so, we already did the calculations, the
12   interference to the basis set will not be
13   unacceptable, and if the calculations have not yet
14   been done, then a new set of calculations would need
15   to be done and possibly a new class created.
16        That's what the ANSI standard does.
17        Q    So the classes in the T1.417 standard,
18   they introduce additional constraints to the
19   existing DSL standards?
20   A    I didn't say that.
21        Q    It's not true that the T1.417 classes
22   added additional constraints, that's not --
23   A    No, that's a different question.  I certainly
24   didn't say that in my answer to your earlier
25   question.  I said, with the new service.  I didn't
```

ANTHONY ACAMPORA
March 17, 2014

1    say, DSL service -- an existing DSL service.  It

2    would be any service being considered.  The new

3    service could be a proprietary service, who knows.

4    It may not be XDSL at all.  Then its parameters

5    would be defined in such a way as to ensure spectrum

6    compatibility with the basis set.

7            Now, if that new service is DSL, perhaps

8    there is a constraint required and perhaps there is

9    not a constraint required.  It may already fit in to

10   an existing -- an existing class or the parameters

11   in its standard may be such that they don't need to

12   be further constrained, you can simply accept that

13   the XDSL standard as defining the parameter set for

14   a class such that compatibility with the basis set

15   is ensured.

16           And you might not be constrained at all.  It

17   might perfectly well fit in.  In fact, if you look,

18   there's a pretty close resemblance, and if you give

19   me the standard, I could point it out to you,

20   between the spectrum management classes of the

21   standard and the DSL standards themselves.  In power

22   spectrum, PSD, template, the mask, two different

23   things, and the power levels.

24           Other requirements as well, transverse

25   balance, longitudinal voltage, there are other

ANTHONY ACAMPORA
March 17, 2014

```
 1    requirements as well.
 2         Q     But isn't it a fact that there are
 3    additional constraints in T1.417 for existing DSL
 4    standards?
 5    A     Not necessarily.
 6         Q     But --
 7    A     In fact, in some cases, it's -- the masks are
 8    looser.
 9         Q     But, in some cases, there are
10    additional constraints?
11    A     I would have to look at the standard.  You'd
12    have to show me the standard.
13         Q     So you're not sure if there are
14    additional constraints added?
15    A     There might be in some cases, and in some
16    cases, there are not.
17         Q     So the T1.417 standard defines some
18    number of classes.  Correct?
19    A     That's one of the things, yes.
20         Q     And you're not sure if those classes
21    define additional constraints over the existing DSL
22    standards?
23    A     No, I answered it, in some cases yes, in some
24    cases no.
25         Q     Okay.  So why would there need to be
```

ANTHONY ACAMPORA
March 17, 2014

1    additional constraints added to your existing DSL

2    standards?

3              MR. REED:  Object as to form.

4    A      Well, I could hypothesize, a new XDSL system

5    being proposed, and if we looked at the proposed PSD

6    and power and transverse -- I'll omit the list of

7    other features, but if the calculations are made on

8    this new proposed version of DSL, which might even

9    be a proprietary version, who knows, because -- and,

10   again, I'm hypothesizing -- it would be determined

11   that spectral compatibility in this 99 percent sense

12   with the basis set could not be assured.

13             But if the specifications were tightened,

14   then it would -- it might even develop that the

15   calculations are done first, then the standard for

16   this new DSL are selected to conform with the

17   requirement that unacceptable interference not be

18   created an adjacent systems.

19        Q      So did I hear you say that the T1.417

20   standard tightens the constraints for existing DSL

21   systems to make them 99 percent spectrally

22   compatible?

23             MR. REED:  Object as to form.

24   A      No, you did not hear me say that.

25        Q      So explain -- so, for existing XDSL

ANTHONY ACAMPORA
March 17, 2014

```
 1   systems, are we agreed that there's some constraints
 2   added by T1.417 to the existing XDSL services?
 3   A       I didn't say that.
 4       Q       Okay.  So you're not aware that, for
 5   XDSL services existing at the time, you're not sure
 6   that T1.417 standard added additional constraints on
 7   top of that?
 8   A       Yeah, I don't think they did.  In some cases,
 9   it might have and in some cases they did not.
10       Q       But you just said in some cases they
11   did, for existing XDSL services?
12   A       You'd have to show me the standard.  I
13   just -- I haven't memorized every version of DSL
14   what the power spectral density requirements are,
15   how that relate to the power spectral density of the
16   different classes defined by the spectrum management
17   standard, but the way, which didn't exist on the
18   patent.  You'd have to show me the standard, I can't
19   go beyond that.
20       Q       Okay.  So you're not completely sure
21   without the standard in front of you that the T1.417
22   standard added existing constraints on top of
23   existing XDSL standards?
24   A       Well, I couldn't tell you anywhere -- a
25   specific instance where it added additional
```

ANTHONY ACAMPORA
March 17, 2014

```
 1   constraints.  It might have, but I couldn't tell you
 2   in a specific instance where it did.
 3          Q     Okay.
 4                Did you consider -- are the existing
 5   XDSL standards, at the time the T1.417 was
 6   published, are those XDSL standards spectrally
 7   compatible?
 8   A      You know, you're asking for the first version
 9   of the -- of T1.417 standard?
10          Q     Yes.  Before the first version of the
11   T1.417 standard, there's some existing XDSL
12   standards.
13   A      That's correct.
14          Q     Are they already spectrally compatible?
15                MR. REED:  Object as to form.
16   A      With what?
17          Q     Each other.
18   A      I don't know, but, again, that's not an issue
19   that's addressed by the standard.
20          Q     Isn't it true that the T1.417 standard
21   imposed additional constraints to define spectral
22   compatibility among the existing DSL standards?
23                MR. REED:  Objection.  Asked and
24   answered.
25   A      I don't think that -- again, the standard
```

ANTHONY ACAMPORA
March 17, 2014

```
1   doesn't require spectrum compatibility among

2   different spectrum management classes, it requires

3   spectrum compatibility between each member of the

4   set of classes and the basis set.

5          Unless one of those classes were added to the

6   basis set, there's no intent, no objective of

7   ensuring compatibility among different classes

8   themself.

9          In this 99 percent sense, once again, in

10  99 percent of installations, unacceptable

11  interference into an existing basis set will not

12  occur.  Ninety-nine percent of the time it will not

13  occur.

14         Q    So with this 99 percent result, could

15  that be achieved without the T1.417 standard?

16  A    Sure.

17         Q    So would it be ensured by the

18  definitions of existing DSL standards that there

19  would be 99 percent spectral compatibility?

20              MR. REED:  Objection to form.

21  A    I don't understand the question.

22         Q    Huh?

23  A    I don't understand the question.

24         Q    So you just said the T1.417 standard

25  with the constraints that the T1.417 standard
```

ANTHONY ACAMPORA
March 17, 2014

```
 1    introduced, it ensures a 99 percent spectral
 2    compatibility between the basis systems, right?
 3                  MR. REED:  Object to the form.
 4    A       I didn't say that, no.
 5        Q       All right.  I'm just -- what result
 6    does the additional constraints in T1.417 standard
 7    achieve?
 8    A        What additional constraints?
 9        T1 -- what the standard did was create
10    classes, standardized classes, with defined
11    properties such that if the new service complies
12    with the constraints of a particular class, it is
13    guaranteed with 99 percent confidence that
14    unacceptable interference will not occur on any
15    subscriber line in the same bundle carrying one of
16    the basis services.
17        Q       So you just used the word "guaranteed."
18    A       With 99 percent.
19        Q       So in the absence of T1.417 standard,
20    would that guarantee not exist?
21                  MR. REED:  Object as to form.
22    A       It might.
23        Q       But there's no guarantee, correct?
24    A       I disagree.  It might.
25        Q       So what is the purpose of --
```

ANTHONY ACAMPORA
March 17, 2014

1    A      In fact, it might be better than 99 percent.

2           Q      So what is the purpose of the T1.417

3    standard?

4    A      Basically, it was forward looking, future.

5           A big part of the standard is the definition

6    of the calculations that must be performed in the

7    event a new service does not conform to a new system

8    class.  So it was a way of basically creating and

9    expanding the set of known spectrally compatible

10   classes, not the spectrally compatible, once again

11   meaning that it's 99 percent of -- way of avoiding

12   interference to a basis system, and there's a whole

13   list of basis systems that were defined.

14          Q      So you're talking about there's a

15   method A and method B in the T1.417 standard?

16   A      That's right.

17          Q      And method A was a class based way of

18   approving spectral compatibility?

19   A      Correct.

20          Q      And method B was a calculation?

21   A      Calculation base, right.

22          Q      Is method A unnecessary given the XDSL

23   standards definitions at the time?

24   A      Is A unnecessary?

25          I wouldn't say they were necessarily

**ANTHONY ACAMPORA**
**March 17, 2014**

```
 1    unnecessary before the fact but after the fact they
 2    might have been unnecessary.
 3           It's entirely possible that existing DSL --
 4    some existing DSL standards conformed with what
 5    became class 1 and/or class 2 and/or class 3.
 6           Q     What do you mean when you say, "before
 7    the fact," the fact --
 8    A      This 99 percent of -- just by running the DSL
 9    at its maximum capability, PSD, power, and so forth,
10    might have resulted in a situation where 99 percent
11    of the time it was not unacceptable degradation to
12    an existing -- to any of the basis systems that were
13    defined by the standard.  That might very well be
14    the case, and in which case it might also have been
15    the case that the standard body, after confirming
16    that by calculation, simply ratified that
17    preexisting standard as one of the classes.
18           Q     So if the preexisting classes were
19    99 percent spectrally compatible, the classes
20    defined in the T1.417 standard would be unnecessary.
21                 Do you agree with that?
22                 MR. REED:  Object to the form.
23                 Did you finish your question correctly?
24    I think you used the wrong word.
25    A      Yeah, I was going to ask you if you could
```

ANTHONY ACAMPORA
March 17, 2014

1    repeat that, because I assume that question didn't

2    come out right.

3              MR. SUN:  Could you repeat that -- read

4    that back?

5         (Stenographer reads back as requested.)

6         Q     Let me rephrase the question.

7    A     Yeah.

8         Q     So if the preexisting DSL standards by

9    themselves were already 99 percent compatible, with

10   each other, would the classes defined in the T1.417

11   standard be unnecessary.

12   A     Yes.

13        It would serve no purpose.  Run the DSL,

14   don't worry, don't worry -- not don't worry about

15   it, it would have not been a reported instance of

16   unacceptable degradation except 1 percent of the

17   time.

18        Q     And the T1.7 -- T1.417 standard came

19   about because people were not sure the preexisting

20   DSL standards would be 99 percent spectrally

21   compatible?

22   A     Not right.  Not correct.

23        Q     Please correct me.

24   A     Well, okay, I'm going to be repeating myself,

25   but what the intent of the ANSI standard is -- the

**ANTHONY ACAMPORA**
**March 17, 2014**

1   spectral management class standard is, is to create

2   classes, some of which may conform with existing DSL

3   standards, to create classes such that if your

4   system complies with one of these standardized

5   classes, in 99 percent of the time you will not

6   unacceptably degrade a basis set, the ANSI standard

7   also defining that basis set.

8         What are the services that we're trying to

9   protect?  That was the intent of the ANSI standard.

10        And there's also no requirement that anyone

11  conformed to the standard.  You can -- you can --

12  these are guidelines.

13        Q     So I guess let me repeat what you said.

14        So the classes are defined so that if

15  some service falls into one of these classes, it

16  would be guaranteed to not excessively interfere

17  with some list of basis services?

18  A     That's sort of correct --

19        Q     Okay.

20  A     -- yeah.

21        Q     Is there something you encountered with

22  what I just said?

23  A     You'd have to repeat it again.  I think you

24  were trying to paraphrase some of my earlier

25  testimony.  I think you got a lot --

**ANTHONY ACAMPORA**
**March 17, 2014**

```
 1          Q      Okay.
 2     A      -- it wasn't my exact words, but I think you
 3     might have captured a lot of the intent.
 4          Q      Okay.  So there is some classes in
 5     T1.417 standard?
 6     A      There are.
 7          Q      And the -- if a service falls within
 8     one of these classes, then that service is
 9     guaranteed to be 99 percent spectrally compatible
10     with an existing set of basis DSL services?
11     A      You understand it being the spectrally
12     compatible -- I think that was your word -- meaning
13     that 99 percent of the time that that service
14     conformed with that class will not unacceptably
15     interfere with an existing basis service.
16          Q      And so with that purpose in mind, do
17     the DSL -- existing DSL standard definitions achieve
18     that purpose?
19               MR. REED:  Objection as to form.
20     A      At what point in time?
21          Q      At the time of -- before the -- before
22     the standard was published.
23     A      You mean the first version of the standard?
24     So it was the direct standard, then --
25          Q      Correct.
```

ANTHONY ACAMPORA
March 17, 2014

```
1    A      So -- but, sequentially, it was a direct
2    standard, then the patent was filed, then there was
3    an issued standard, a ratified standard --
4           Q      Yes.
5    A      -- and you're asking about that first
6    ratified standard -- the first ratified standard.
7           Q      Yes.
8    A      And you're asking did DSL at the time -- did
9    any version of DSL conform with that first standard?
10          I believe the answer to that question is,
11   yes.
12          Q      So before the standard, if we just
13   operated within the existing DSL standards, there
14   would be 99 percent spectral compatibility with the
15   existing basis systems?
16   A      For some versions of DSL that existed at the
17   time, yes.
18          Q      Then there's really no need for the
19   T1.417 standard?
20   A      Well, I already testified the standard was
21   sort of forward looking and there were a lot of new
22   versions of DSL becoming available.  And, by the
23   way, this was -- that standard was not intended only
24   for DSL, it was intended for anything you wanted to
25   do on the line just to offer you some feedback and
```

**ANTHONY ACAMPORA**
**March 17, 2014**

1    some advice as to whether you were being a good

2    neighbor.

3          There wasn't even a requirement that any new

4    service conformed to the standard.  You could be a

5    bad neighbor.

6          Q    Uh-huh.  Okay.

7                So I guess one purpose that this T1.417

8    standard adds over the existing DSL standards is it

9    adds in a way of constraining future systems to

10   coexist with existing DSL systems?

11   A    No, it doesn't do that.

12         Q    But you said it was future looking.

13   Correct?

14   A    That part is true.

15         Q    So the T1.417 standard is attempting to

16   protect existing DSL systems against future

17   services?

18   A    That part is not true.

19         Q    How would you say it?

20   A    I don't know what you're driving at.  That

21   statement isn't true.

22         Q    What do you mean by "future" or

23   "forward looking"?

24   A    Okay.  Forward looking in the following

25   sense -- following senses:  A, someone has this idea

**ANTHONY ACAMPORA**
**March 17, 2014**

1    for a new service to be offered over a subscriber

2    line.  There is a basis set of services defined by

3    the standard.  Does this new service -- is this new

4    service a good neighbor?  Good neighbor meaning with

5    99 percent confidence, will it not unacceptably

6    interfere with an existing basis service in the same

7    bundle as the new service.

8         What the standard did was provide, in the

9    first case, a way of addressing that question, does

10   this new service conform with one of these classes?

11        Or, second way, if it doesn't conform with an

12   existing class, here are the calculations that you

13   need to perform to establish whether what you're

14   planning to do is or is not spectrally compatible,

15   that spectral compatibility, once again, meaning not

16   unacceptably interfering with the basis service more

17   than 1 percent of the time.

18        Q    So let me try to rephrase it.

19             So it's a way -- the T1.417 standard is

20   a way of blessing a new service to ensure that it

21   doesn't interfere with the predefined list of --

22   preexisting list of basis systems?

23   A    That's correct.

24        Q    Okay.  And that is something that the

25   existing DSL standards didn't define?

**ANTHONY ACAMPORA**
**March 17, 2014**

```
 1   A      What's that?
 2        Q    A way of blessing the new service
 3   against existing DSL services -- or basis services.
 4   A      It may not have needed to be.  It may already
 5   have conformed with what became a -- I think, using
 6   your word -- blessed class --
 7        Q    So --
 8   A      -- or stated otherwise, the standards body
 9   might have ratified an existing DSL standard.
10        Q    So even with this new purpose, there's
11   real no need for a T1.417 standard?
12              MR. REED:  Objection to form.
13   A      In hindsight, it may have served no -- it
14   might have served no purpose.
15        But I actually don't think that's the case,
16   but for some existing DSL, it might have provided a
17   no -- no value.  The impact on basis systems with or
18   without that standard might have been -- the delta
19   impact might have been zilch.
20        Q    So for that to be true, what you're
21   saying is if a new service fell into one of the
22   existing standards for DSL standard, it would -- it
23   would just automatically be spectrally compatible
24   with the basis systems?
25   A      Might have happened.
```

1          Q     If a T1.417 standard did not add

2    anything, any sort of assurance, or -- over that,

3    or --

4    A     Well, like I said, the impact, if that

5    standard had never been brought into existence, of

6    some preexisting DSL service on the basis services

7    might have been the same with or without that

8    standard.

9          Okay.  With the standard -- at a minimum,

10   what the standard brought was the definition of the

11   basis set to be protected.  But even there, they are

12   what they are.  Without that standard ever existing,

13   those services might have already been protected by

14   an existing DSL service.

15         Q     Okay.  So at the very least, the

16   standard expressed an intent to protect some set of

17   basis sets?

18   A     But everyone knew that there would be -- from

19   the very beginning, at a minimum, DSL protected the

20   voice band.  There is no DSL operating above the

21   voice band.  At a minimum, there was always an

22   intent to maintain spectral -- spectral

23   compatibility with the base band -- with the voice

24   band.

25         Q     But didn't the T1.417 introduce the

ANTHONY ACAMPORA
March 17, 2014

```
 1   methodology to determine that easily?
 2   A      No.  That was known and done well before the
 3   standard.
 4        Q      But the actual definitions in the
 5   classes didn't exist until T1.417?
 6   A      Well, some of them did.
 7        Q      And you're saying the preexisting
 8   definitions were already 99 percent spectrally
 9   compatible, and so the T1.417 definitions were sort
10   of superfluous?
11   A      No, I didn't say that.
12        Q      Can you correct what I said -- what I
13   just said?
14   A      I'm not sure what you're -- what you're
15   trying to say, so no.
16        Q      I guess I'm just trying to figure out
17   what -- you said "delta value."
18            What specifically was the delta value?
19   Why do people sit down to try to create the T1.417
20   standard?
21   A      To create classes that, with 99 percent
22   certainty, would not unacceptably degrade a defined
23   set of basis services.
24            Now, without that standard, there was some
25   basis services for which that 99 percent
```

**ANTHONY ACAMPORA**
**March 17, 2014**

1    guarantee -- in fact, it was probably closer to 100

2    percent, you know, because that 1 percent at the

3    time you may unacceptably degrade, maybe it was like

4    .1 percent, .01, even lower, an existing DSL service

5    would not -- would not unacceptably degrade an

6    existing basis set -- an existing member of what

7    ultimately came of basis set.

8         The specific example I gave was voice band.

9    Voice band -- preexisting voice band data services

10   that went back 50 years, maybe more, were immune to

11   ADSL, designing the ADSL standard.  That

12   compatibility was there by design from day one,

13   because that voice band is going to be carried over

14   the same copper wire that carries the DSL.

15        So they were spectrally separated.  DSL

16   services, you get the high band.  Voice band, you

17   get the low band.  And you will not mutually

18   self-destruct.

19        Q     But didn't the T1.417 standard expand

20   upon voice band to add to that protected list?

21   A     It did.

22        Q     And that wasn't something that was done

23   before the T1.417 standard?

24   A     That expansion?  Well -- well --

25        Q     That added protection, yeah.

ANTHONY ACAMPORA
March 17, 2014

1    A      That's not completely true either.

2           So there was a set that was protected

3    automatically without any standard.  What the

4    standard might have done is identify some additional

5    outliers that weren't already protected and set

6    about trying to create guidelines to protect those.

7           Now, existing DSL standards at that time may

8    already have protected some of that basis set, in

9    fact, it may have protected the expanded basis set.

10   Then there were additional services, which that

11   might not have been the case, and those services

12   were then sculpted so that they would not

13   unacceptably degrade.

14          But, again, it was intended to look forward

15   primarily.

16          Q      And that description is the delta add

17   over existing DSL standards in the T1.417 standards?

18   A      I'm not sure what you're referring to now.

19          Q      What you described with the outlier

20   cases and --

21   A      No.  When I used a phase "delta" earlier,

22   what I said was the impact -- the delta impact,

23   which -- of an existing DSL service on an existing

24   basis service with or without that standard would

25   have been nearly zilch.

ANTHONY ACAMPORA
March 17, 2014

```
 1            That's what I said.

 2            Q      Okay.

 3                   MR. REED:  We've been going about an

 4      hour, is it about time for a break?

 5                   MS. DAVIS:  Yes, yeah, let's take a

 6      break.

 7                   (Recess taken at 2:34 p.m.)

 8                   MR. SUN:  Back on the record.

 9      BY MR. SUN:

10            Q      Okay.  So change of topic.  So let's go

11      to page 144 in your report.

12                   And just discussing -- this is just

13      discussing Palm and claim 1 of the '472 patent?

14      A      Yes.

15            Q      There's a limitation here that says,

16      "Measuring subscriber loop characteristics"?

17      A      Yes.

18            Q      Can you provide a plain and ordinary

19      meaning -- definition of "loop characteristics"?

20                   And if you need to look at the '472

21      patent --

22      A      Yeah, why don't we get a copy of that.

23            Q      Okay.

24                   MR. SUN:  This is Exhibit 10.

25                   (Exhibit received and marked Acampora 10 for
```

ANTHONY ACAMPORA
March 17, 2014

```
 1           identification.)
 2    BY MR. SUN:
 3           Q      Exhibit 10 is a copy of the '472 patent
 4    to Bremer and Kyees.
 5                 Yeah, I can represent to you this is
 6    not actually a disputed statement.
 7    A      Well, measuring subscriber loop
 8    characteristics is.
 9           Q      Or -- so what I'm interested in is just
10    a definition of loop characteristics.
11    A      I'm not so sure that's not a -- well, I guess
12    it's not.  I'm looking at both sides post
13    construction.  They both include the phrase
14    "subscriber loop characteristics."
15           So I guess subscriber loop characteristics
16    per se is not in dispute.
17           Okay.  And so your question is once again?
18           Q      So I know it's not disputed, but having
19    conducted your analysis, you must have had some idea
20    of what loop characteristics meant to a person of
21    ordinary skill in the art.
22                 And so what is -- can you explain that,
23    if you would explain it to a ten year old, what is
24    "loop characteristics"?
25    A      I'm not so sure that it could be explained to
```

ANTHONY ACAMPORA
March 17, 2014

```
 1    a ten year old, but I'll do the best I can.
 2            Q     Okay.
 3    A     So, first of all, loop, that's the twisted
 4    pair wire that connects a subscriber premises to
 5    carry a plant, and there are attributes associated
 6    with that loop, many attributes:  The length, the
 7    frequency response, the existence of bridge taps,
 8    loading coils, these -- loss, impedance, balance,
 9    cross talk.  There are all of these, and probably
10    more that I didn't include in the list, would fall
11    under the broad understanding of loop
12    characteristics.
13            Q     If they were to capture that with a
14    phrase definition instead of listing -- listing
15    these types of properties?
16    A     Loop characteristics.
17            Q     Okay.  Okay.
18                  And let's go to now page 149.
19    A     What page is that?
20            Q     149 in your report.
21                  And there's another element of claim
22    '472 there -- or, I'm sorry, patent '472, claim 1
23    and that's enabling the operator transceiver.
24                  And I'm really just interested in the
25    word "enabling."  Can you give the definition you
```

**ANTHONY ACAMPORA**
**March 17, 2014**

1   used for enabling, what that word means?

2   A     Well, for the '472 patent, the phrase

3   "enabling the operating transceiver" is a disputed

4   term.  I applied both of these constructions in my

5   analysis.

6         Q     What page of the construction are you

7   looking at?

8   A     I'm look at page 27 of my report.

9         Unless I'm misreading something, one of the

10  disputed terms is "enabling the operating

11  transceiver."

12        Q     So we're not interested in the last

13  three words, "the operating transceiver," just

14  "enabling."

15             And it appears the parties --

16  Brandywine just stuck to the word "enabling" and AT

17  & T's construction is just automated connection.

18             So if we put aside the -- that

19  "automated" part, so just ignore whether enabling

20  has to be automated or it could be nonautomated, do

21  you have a definition for what the word "enabling"

22  means?

23             MR. REED:  Object as to form.

24  A     In the context of this patent, the claim,

25  yes.

ANTHONY ACAMPORA
March 17, 2014

1        Q      So what does that mean, to enable a

2   transceiver, as part of this claim.

3   A        Enabling the transceiver did you say?

4        Q      Yes.

5   A        Well, I guess now I'm not sure what you're

6   asking.

7          That's a term -- that's almost a complete

8   phrase in dispute.

9          I applied both constructions.

10        Q      Uh-huh.  So when you applied -- do you

11  believe that AT & T's construction and Brandywine's

12  construction differ on what the word "enabling"

13  means as you applied it here?

14  A        Well, okay, there's an issue here.

15  Brandywine's proposed construction -- and I think

16  you even stated it before -- may not -- Brandywine

17  apparently believes that plain and ordinary meaning

18  of enabling based on its infringement contentions is

19  automatically or manually connecting.

20        Q      Yeah.

21  A        AT & T believes that enabling in the context

22  of enabling the operating transceiver would require

23  that this process be automated.

24          So Brandywine apparently believes that this

25  phrase should get its plain and ordinary meaning,

ANTHONY ACAMPORA
March 17, 2014

1    and that plain and ordinary meaning would be

2    somewhat broader than AT & T's meaning.

3         But that is the issue that the court is being

4    asked to apply.  I considered both of these, and, in

5    fact, as far as Brandywine -- as far as Palm

6    disclosing this limitation, it would be so disclosed

7    under both constructions, because in Palm it is

8    automated.  Brandywine would include both.

9         Q    Okay.

10   A    Now, in the context of this patent, I have

11   not formed an opinion of how this phrase should be

12   properly constructed.  I've offered no opinions on

13   claim construction.

14        Q    So putting aside the automated and

15   nonautomated issues, you also had to just have in

16   mind what the word "enable" means or "enabling"

17   means whether or not it has to be automated or not.

18        So I'm just interested in what in your

19   mind the word "enabling" means.

20        MR. REED:  Object as to form.

21   A    That's precisely what I didn't do, because

22   that's a claim construction issue, and I steadfastly

23   avoided trying to interpret the words of the patent

24   as they would be understood by one of skill in the

25   art if doing so would cause me to take a position on

ANTHONY ACAMPORA
March 17, 2014

```
 1   proper construction of any disputed term.
 2        So I did not do that.
 3        Q     Okay.
 4   A     And I can't do it now, unless you want me
 5   to -- unless you're willing to spend a great deal of
 6   time by doing that.
 7        Q     Okay.  Let's just look at AT & T's
 8   construction.
 9              What does it mean to automatically
10   enable a transceiver?  What do you do to enable a
11   transceiver?
12              MR. REED:  Object to form.
13              This states construction.
14   A     AT & T's construction did not say automated
15   enabling.
16        Q     Let me rephrase it.
17              The construction is automatically
18   connecting?
19              MR. REED:  You're almost there.
20        Q     Automated connection of the chosen
21   hardware transceiver.
22              So how did you apply this construction?
23   What does "automated connection of the chosen
24   hardware transceiver," what does that mean?
25   A     Okay.  That question I think I understand.
```

ANTHONY ACAMPORA
March 17, 2014

```
 1              Performed by a machine entirely.
 2         Q     So -- okay.
 3              But what does it mean to be
 4    performed -- what does performed by a machine
 5    entirely, what actions?
 6    A    Bear with me a second, I want to make sure
 7    I'm not getting too much stuff out of order here.
 8              I'm sorry, once again?
 9         Q     So what action is being performed by a
10    machine?  That's what I'm asking you.
11              What is the action of enabling that you
12    applied to your analysis?
13    A    Well, in the context of claim 1 of the '472
14    patent, AT & T's proposed construction to me means
15    connecting the chosen hardware transceiver with the
16    subscriber line -- no, let me restate this.
17         Using only a machine to connect the chosen
18    hardware transceiver to the subscriber line.
19         Q     Okay.
20              So connecting is enabling?
21    A    I didn't say that.
22         Q     What did you just define there?  The
23    entire phrase, enabling --
24    A    Well, I think you were asking about --
25         Q     AT & T's.
```

**ANTHONY ACAMPORA**
**March 17, 2014**

```
 1    A       -- enabling the operating transceiver.  I
 2    thought you were asking how did I interprets AT &
 3    T's proposed construction.
 4            Q       Uh-huh.
 5                    And you just read back to me AT & T's
 6    construction?
 7    A       I did not.
 8            Q       Okay.  Can you repeat that again?
 9    Or --
10    A       I think you're asking about the automated
11    connection.  And I think what I said was, using only
12    a machine to connect the chosen hardware transceiver
13    to the subscriber line.
14            Q       When you say, "connect," you mean
15    physically connect?  Or did you mean something --
16    A       Allow the signal to flow from the chosen
17    hardware transceiver to the subscriber line.
18            Q       That's -- that's the understanding you
19    applied in your analysis?
20    A       Doing that entirely by a machine.
21            Q       Got it.  Okay.
22                    One last thing.  Can you turn to
23    page 7?
24    A       Page?
25            Q       Seven of your report?
```

**ANTHONY ACAMPORA**
**March 17, 2014**

```
 1    A        Seven.

 2            Q     Do you see under anticipation there's a

 3    sentence that says, "Understand that patent claims

 4    are presumed valid and can be determined to be

 5    invalid only if based on clear and convincing

 6    evidence."

 7                Do you see that?

 8    A        What line are you looking at?  I was trying

 9    to follow you.

10            Q     Page 7, line 10.

11    A        Yes.

12            Q     Okay.  And that's the standard you

13    applied throughout your report, the clear and

14    convincing evidence standard?

15    A        Well, yes, I did.

16            Q     Okay.  If you look at now page 10, the

17    bottom, starting from the line 27 on page 10.

18                Here it's talking about the law of

19    indefiniteness, and this is the law of

20    indefiniteness that you applied in your report.  Is

21    that right?

22    A        Well, you characterize it as being a law of

23    indefiniteness --

24            Q     Or --

25    A        -- what I was -- I'm not a lawyer.  You asked
```

**ANTHONY ACAMPORA**
**March 17, 2014**

1    me about that earlier.

2          Q     Sure.

3    A     What I did was I was provided with some legal

4    guidelines --

5          Q     Okay.

6    A     -- to be followed in forming my opinions.

7    That's what I did.

8          Q     Okay.  So these are legal guidelines

9    that you followed in your indefiniteness analysis,

10   correct?

11   A     That's correct.

12         Q     Okay.  So just look at page 10 starting

13   at 27.

14               Let me know when you're done.

15   A     I'm done.

16         Q     Okay.  So do you understand there's a

17   distinction between patent board decisions and U.S.

18   District Court decisions?

19               Do you understand that?

20               MR. REED:  Object as to form.

21   A     Well, I don't have any understanding of that

22   one way or the other.  I was given these guidelines

23   to follow.

24         Q     Okay.  Do you know that the patent

25   board is making its decision during examination of

ANTHONY ACAMPORA
March 17, 2014

1    patent claims, while invalidate a patent, the

2    District Court is making a decision after the patent

3    has issued?

4    A       That's my understanding.

5            Q       Okay.  Do you know if the patent

6    board's decisions are employing the clear and

7    convincing standard?

8                    MR. REED:  Object to the form.

9    A       Board's decisions.

10            Whatever the patent board does is -- my

11    understanding of what they -- the board does as a

12    procedure, as an examiner, as a supervisor, is an

13    appeals process, and based upon what art, what other

14    circumstance might be considered by the examiner, or

15    the patent office, let's say, it decides whether it

16    believes that a claim as written is allowable or

17    not.

18            Q       Okay.  So when a patent board issues a

19    decision to reject a claim under examination, is it

20    employing the clear and convincing standard?

21                    MR. REED:  Objection.  Calls for a

22    legal conclusion.

23    A       Yeah, I don't have an opinion on that.  I --

24    I -- I can't answer that question.

25            Q       Okay.  So you don't know if this

ANTHONY ACAMPORA
March 17, 2014

1    paragraph of guideline that you used is using the

2    clear and convincing standard?

3    A      Well, the answer to your question is no, but

4    I would read this as being, in this one instance,

5    maybe being even a higher barrier than clear and

6    convincing.

7          And, by the way, we spoke about this earlier,

8    I had some opinions on -- and this is the '508

9    patent, where the claim reads, as defined by a

10   standard -- I believe that's the language, but I can

11   check that to make certain -- and at that time it's

12   not the question of, well, what standard existed,

13   did I apply this patent board's consideration or not

14   in my analysis, and I certainly was aware of this

15   patent board rule, but in that particular instance

16   there was no standard whatsoever.  There was no

17   standard.

18         So it's not a case that the patent is limited

19   to a standard that existed on the date it was filed,

20   that appears to be what the patent board's rule

21   would require, but in the case of the '508 patent,

22   in fact, there was no standard on spectrum

23   management, or spectrum management class.

24         There was the draft standard, but that's it.

25         Q      But in your analysis of indefiniteness,

ANTHONY ACAMPORA
March 17, 2014

1    you are relying on this patent board decision?

2    A       Well, I'm not sure that's quite right.  I did

3    not independently determine whether the phrase

4    "spectrum management class" is indefinite.  I simply

5    applied two sides' proposed construction.  AT & T

6    said it's indefinite.

7           And -- just bear with me for a moment.

8           So in regard to that limitation in claim

9    '508, including -- which included spectrum

10   management class, my analysis basically looked at

11   Brandywine's proposed construction now

12   independently.

13          I did offer an opinion on page 34 of my

14   report that the asserted claims of the '501 patent

15   are indefinite, and I give the reason why.  "Each of

16   those claims includes limitations directed to

17   various components involving the 'spectrum

18   management classes defined by a standard' or similar

19   language,"  I said '501 patent.

20          "In my opinion, this phrase renders the

21   asserted claims 'not amenable to construction' or

22   'insolubly ambiguous' as the claims fail to

23   delineate the scope of the invention using language

24   that adequately notifies the public of the

25   patentee's right to exclude."

ANTHONY ACAMPORA
March 17, 2014

1          And I just testified, and now I'm reading

2     back from my report.  As discussed in section 9.A.1

3     of my report, the applicants admit that, as of the

4     filing date, the contents of the finalized ANSI

5     standard were unknown.  Yet, also state that the

6     present invention is capable of being utilized to

7     determine the appropriate spectrum management class

8     or classes defined in the aforementioned American

9     National Standard of Telecommunications."

10          So on the basis of that I formed an opinion:

11     The scope of the claims are indefinite.  They depend

12     on both the existence and the specified content of

13     the ANSI standard that did not yet exist at the

14     moment.

15          And I believe the applicants even said they

16     would be subject to change.  If one does not know

17     the actual contents of the standard, then I don't

18     see how one could determine the bounds of the claim

19     this particular apparatus, infringing or not

20     infringing, without knowing the criteria to apply.

21     It just wasn't known.

22          Q     Okay.  So on that basis you think it's

23     indefinite?

24     A     That's correct.

25          Q     Okay.

**ANTHONY ACAMPORA**
**March 17, 2014**

1            MR. SUN:  That's all I have.

2            MR. REED:  I have no questions.  I want

3    a copy and I would also like a rough.

4            MR. SUN:  I wanted the rough as well,

5    yes, yes expedited.  Thank you.

6            (Concluded at 3:23 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ANTHONY ACAMPORA
March 17, 2014

```
 1
 2                      CERTIFICATE OF OFFICER
 3          I, THERESA L. TIERNAN, A Notary Public and
 4   Certified Court Reporter, do hereby certify that prior
 5   to the commencement of the examination,
 6                      ANTHONY ACAMPORA
 7   was sworn by me to testify the truth, the whole truth
 8   and nothing but the truth.
 9               I DO FURTHER CERTIFY that the foregoing
10   is a true and correct transcript of the testimony as
11   taken stenographically by and before me at the time,
12   place and on the date herein before set forth.
13               I DO FURTHER CERTIFY that I am neither a
14   relative nor employee nor attorney nor counsel of any
15   of the parties to this action, and that I am neither a
16   relative nor employee of such attorney or counsel, and
17   that I am not financially interested in the action.
18
19
20
21
22          THERESA L. CARIDDI TIERNAN, CCR, RMR
            Notary Public
23          C.C.R. License No. XI01210
24
25
```